No. 33,447

VERNER R. SHOUP, *Appellant,* v. THE FIRST NATIONAL BANK OF HAYS et al., *Appellees.*

(67 P. 2d 569)

Opinion filed May 8, 1937.

*George B. Collins,* of Wichita, *John L. Hunt, Margaret McGurnaghan, John H. Hunt, George M. Brewster,* all of Topeka, and *J. B. McKay,* of El Dorado, for the appellant.

*D. M. McCarthy,* of Hays, *James E. Smith, E. H. Hatcher* and *Frank H. McFarland,* all of Topeka, for the appellees.

The opinion of the court was delivered by

THIELE, J.: This was an action to enforce performance of contracts for delivery of oil and gas leases. Plaintiff appeals from an order sustaining a demurrer to his evidence, and from judgments in favor of certain of the defendants.

The following facts are admitted by the pleadings. On October

29, 1934, defendants, Paul Karlin and wife, executed an oil and gas lease covering the south half of section 1, township 12, range 18, Ellis county, to Edward M. Swearer. This lease was for a primary term of ten years, and provided for delay rentals if no well were commenced on the land before October 29, 1935. The lease was deposited with defendant the Farmers State Bank of Hays for delivery according to the terms of an escrow agreement which will be referred to later. On October 29, 1934, defendants Leo E. Karlin and wife, and Lawrence Karlin and wife, executed two oil and gas leases to Edward M. Swearer, covering the north half of the above-mentioned section, and on the same day defendant Alois E. Karlin executed a similar lease covering the northeast quarter of section 12, in the above-mentioned township and range. These leases were for the same terms, and under like conditions of the first-mentioned lease, and were deposited with defendant, the First National Bank of Hays, for delivery under similar escrow agreements. All of these various escrow agreements, dated October 29, 1934, recited execution of the leases, and that they were placed in escrow to be held and disposed of by the bank on the following conditions:

"If the said lessee or his assigns shall commence or cause to be commenced and continue the operation of the drilling of a well for oil and gas upon the above-described lands or at a location within a radius of —— miles from the above-described lands within 60 days from the date of completing the securing of leases on a block of acreage of 4,000 acres in sections one (1), two (2), three (3), ten (10), eleven (11), twelve (12), township twelve (12), range eighteen (18), and sections thirty-four (34), thirty-five (35) and thirty-six (36), township (11), range (18), the aforesaid bank is hereby authorized and directed to deliver over the aforesaid lease to the said less [lessee], or his assigns."

It was further provided that if the lessee failed to commence the well within the time specified, the bank should return the lease to the lessor, the lease and agreement should be void and rights and liabilities should cease. It was not shown when the block of leases was secured, but on July 24, 1935, the various defendants Karlin and other owners of lands in the block entered into an agreement with Swearer modifying the terms of the escrow agreements. This modifying agreement, after making appropriate reference to the ownership of lands and leases and the wish to modify, recites as follows, the numbers of the paragraphs being inserted for reference hereafter:

1. "Now, therefore, in consideration of the premises and the sum of one dollar ($1) to each of us in hand paid by Edward M. Swearer, the receipt

thereof being hereby acknowledged, we do hereby agree and stipulate with the said Edward M. Swearer that the aforesaid escrow agreements be and hereby are modified and changed to read as follows:

2. "'If the said lessee or his assigns shall commence operations for the drilling of a test well for oil and gas at a location in the ten-acre tract described as the southeast quarter of the northeast quarter of the southwest quarter (SE¼ of NE¼ of SW¼) of section 2, township. 12 south, range 18 west, within five days from the date of this agreement, the aforesaid banks are hereby authorized and directed to deliver over the aforesaid leases to the said lessee or his assigns.'

3. "It being the intention of this stipulation to modify the aforesaid escrow agreements to conform with the stipulation and any provision of any escrow agreement which is inconsistent with the terms hereof is hereby declared of no effect, and further that the operations so commenced shall be continued with due diligence to completion.

4. "All of the other terms and conditions of such escrow agreements to be in no manner changed and to remain in full force and effect."

Although not admitted by the pleadings, there seems to be no question but that Edward M. Swearer on July 28, 1935, assigned all of his interest in the various leases to the plaintiff Shoup.

In his petition plaintiff alleged that with full knowledge and consent of defendants he entered upon the block of acreage, and at the expenditure of large sums of money drilled a test well on the prescribed location; that the operations were commenced within the time prescribed; that each and all of the conditions had been fully and properly met; .that plaintiff was the full, legal and equitable owner of the leases; that all of the conditions had been fully and properly completed on July 28, 1935, and plaintiff was entitled to delivery of the leases; that demands had been made on the escrow banks, and the demands refused. It was also alleged that the well was completed as a commercial producer; that the value of the leases withheld had been greatly enhanced by the drilling of the well and the leases had a value to plaintiff that could not be measured in damages, etc.

We need not notice the answers of the defendant banks, nor any part of the answers of defendants Karlin except their denial the conditions of the agreements for delivery of the leases were complied with on July 28, 1935, and that they alleged that the terms of the original escrow agreement and the modification thereof were never complied with by Swearer or by plaintiff by commencing operations for drilling of a well within the time provided, and that Swearer and plaintiff had forfeited all right to have the leases delivered to them.

On trial, plaintiff offered his evidence tending to show he had complied with the terms and conditions of the escrow agreement and its modification. Defendants' demurrer to plaintiff's evidence was sustained, and he appeals, complaining not only the trial court erred in ruling on the demurrer, but in sustaining objections to certain evidence offered by plaintiff. In his brief, appellant makes no reference to the latter assignments, and they will not be discussed.

In ruling on the demurrer the trial court expressed some doubt whether it should draw inferences from the testimony as to good faith of the plaintiff with respect to some of his operations. Although this statement is the basis for some of appellant's argument, the real question in issue is whether the trial court's conclusion was correct, and not whether the reasons given, and the process used in arriving at the conclusion, were correct.

Although there was considerable testimony bearing on other phases of the action, the question before us is whether plaintiff commenced operations for drilling of a test well within and under the conditions of the escrow agreements of October 29, 1934, as modified by the agreement of July 24, 1935, and our statement will be limited to a statement of the evidence showing what was done in that respect. At the time the leases were procured there had been no oil development in that part of Ellis county. Frank Wassinger assisted Swearer in acquiring the block of leases and had an interest therein, and about June 15, 1935, he had the county engineer stake out a location for a well on the same ten acres as was later described in the agreement of July 24, 1935, and the next day he hired two men to dig a cellar for the proposed well, and this was done. Before this, and in May, 1935, Swearer had contracted with Western Kansas Oil & Refining Company for drilling the well. In June the last-named company made an oral contract with P. G. Reynolds to drill the well. Nothing except digging of the cellar seems to have been done toward drilling the well until after the agreement of July 24, but within five days thereafter some rig timber, band wheel, walking beam, rig bottom timbers, Sampson post, and some other similar equipment was placed on the location. At the time this material was placed, no contract for drilling a well had been made, for Reynolds had trouble finding anyone with tools. On August 23, 1935, a written contract was made between the above company and Swearer as first parties, and Reynolds as second party, for drilling the well. This contract provided the well should be spudded in on

or before October 15, 1935. Neither the company nor Reynolds had equipment necessary to actually drill the well, and the representatives of the company talked with at least half a dozen contractors before they could find one to take the job. As abstracted, some dates are lacking, but apparently in October it was determined that a well could not be drilled where the cellar had been dug in June, and about October 23, 1935, a new cellar was dug. It is not disclosed just when, but a contract was made with the Lario Oil Company to drill the well. When actual operation, as distinguished from preparation to start, commenced is not definitely shown, but the well was spudded November 1, 1935. The Lario Oil Company moved on the location sometime in January or February, 1936, at which time there was a derrick there built by Reynolds. The Lario Company proceeded to drill and completed the well about May 10, 1936.

Appellees filed no counter abstract, but in their brief include a statement of facts, making reference to a transcript not before us, in which it is stated that in September the Karlins notified the parties that because of failure to comply with the terms of the escrow agreement, they wanted their leases back.

Apparently because the trial court expressed some doubt about its rights to draw inferences, but did state it drew the inference there was lack of good faith in appellant's operations, we are furnished in the brief voluminous citations of authority with respect to the trial court's duty in ruling on the demurrer. Appellant correctly contends that certain rules are applicable for determining the sufficiency of his testimony as against a demurrer. They may be summarized as follows: The court is bound to consider all of plaintiff's evidence as true; to consider only the evidence favorable to him and to disregard that unfavorable to him; to make not only inferences favorable to plaintiff but all inferences possible in his favor; not to weigh one part of his evidence that is contradictory of another part nor to weigh any differences between his direct and cross-examination. (*Hill v. Southern Kansas Stage Lines Co.*, 143 Kan. 44, 53 P. 2d 923; *Meneley v. Montgomery*, 145 Kan. 109, 64 P. 2d 550.) And if there is any evidence which sustains plaintiff's case, the demurrer should be overruled. (*Prewett v. Sholl*, 120 Kan. 158, 242 Pac. 149.)

Appellant directs our attention to the second paragraph of the modifying agreement of July 24, 1935, which in the original is marked with quotation marks, and argues therefrom that under its

terms, if operations started within five days he was entitled to the leases, and his proof showing that equipment for drilling a well had been placed on the location within that time, his right to the leases was complete. Although the petition alleged that demands for the leases were made on the escrow banks by appellant, the dates of the demands were not stated. So far as the abstract is concerned, there is no showing that any demand was made at the end of the five-day period or otherwise. Appellee contends that the second paragraph noted may not be read alone, but must be considered with the third paragraph, the latter portion of which provides that the operations so commenced shall be continued with due diligence to completion. The proper construction of the original escrow agreement of October 29, 1934, and the modifying agreement of July 24, 1935, is for the court. It is quite apparent the intention in the first agreement of October 29, 1934, was that operations be not only commenced but continued within sixty days from the completion of the block. When the agreement was modified on July 24, 1935, it seems quite evident it was not the intention to limit the modification to what was said in paragraph 2, otherwise the provisions of paragraph 3 are meaningless. All the paragraphs of the second agreement must be given force, and so considered, they mean not only must the lessee, within five days, commence operations, but he must continue with due diligence.

There is no ambiguity in the original escrow agreement nor in the modification thereof, with respect to appellant's rights and liabilities, but if there were, the fact he did not demand delivery of the leases at the time he caused the first equipment to be delivered on the location is some indication that he did not then believe he was entitled to such delivery. That it was intended not only that operations must be started but must be continued with due diligence to completion is quite evident from the fact that although the lessee had sixty days under the first agreement to commence and continue the operation of drilling a well, all he had caused to be done was to dig the first cellar. We think it clear the purpose of the second agreement was to save the leases for the lessee, and to reinstate the escrow so that he could commence the operations which he agreed should be carried forward with due diligence to completion, that due diligence being consideration, in part, to the lessors for granting the extension.

The question is, Does the evidence tend to show the lessee performed? In considering this question, it must be remembered we

do not have before us the question of operations under the lease, but the question of performance under a contract for delivery of leases. It is beside the point to consider whether the leases provided for due diligence or whether what was or was not done was in compliance with implied covenants.

Appellant contends that the hauling of the materials to the location within the five-day period was sufficient to constitute the commencement of operations for drilling of a well. He directs our attention to *Fleming O. & G. Co. v. So. P. O. Co.*, 37 W. Va. 645, 17 S. E. 203, where it was held that operations were commenced within the requisite time when timbers had been cut for use, though not hauled on the location, but where the location had been staked and a drilling contract let, also to *Duffield v. Russell et al.*, 19 Ohio Cir. Ct. 266, 10 Ohio Cir. Dec. 472, where it was held that staking out the location and buying of timber and beginning to cut it was commencement of operations. In addition, he cites *Henderson v. Ferrell*, 183 Pa. St. 547, 38 Atl. 1018; *Burgess v. Oklahoma Gas Utilities Co.*, 171 Okla. 294, 42 P. 2d 240; *Hudspeth v. Producers' Oil Co.*, 134 La. 1013, 64 So. 891; *Terry v. Texas Co.*, (Tex. Civ. App.) 228 S. W. 1019; *Cromwell v. Lewis*, 98 Okla. 53, 223 Pac. 671, and others to the same general effect. In 67 A. L. R. 526 is an annotation on commencement of development within fixed term as extending term of oil and gas lease, in which the above and other cases are mentioned and commented on.

In a number of Kansas cases a similar question arose but in a manner different from that now before us. In *Hennig v. Gas Co.*, 100 Kan. 255, 164 Pac. 297, an oil and gas lease contained a provision it should be canceled if the lessor made a bona fide sale of the land before the lessee commenced operations to drill, and it was held:

"The driving of a stake locating a gas well and of another stake locating a place to set a boiler to drive drilling machinery does not constitute a commencement of operations to drill, under the provisions of the lease set out in the third section of this syllabus." (Syl. ¶ 4.)

In *Mollohan v. Patton*, 110 Kan. 663, 205 Pac. 643, the action was to cancel a lease because of nondevelopment, and it was held:

"Where an oil and gas lease requires as a condition to its remaining in force that work upon a well shall begin by a certain date and be diligently prosecuted, and drilling is begun on time, the fact that other wells in the neighborhood are subsequently brought in dry does not of itself relieve the lessee from the obligation to continue its prosecution." (Syl. ¶ 1.)

In *Phillips v. Berg,* 120 Kan. 446, 243 Pac. 1054, the action was to quiet title as against an oil and gas lease. There the lease provided for drilling of a well on the premises or within five miles, etc., and it was stipulated therein that the starting of operations should operate as full liquidation of rental provisions. On February 13, 1918, the lessors extended the lease for 180 days, which would be to August 22, 1918. On July 16 two loads of sand were hauled. On July 19 a load of cement and cement staves were hauled to the location to be used for a water tank. Drilling of a water well was commenced August 17 and completed September 12. In December, 1918, and January, 1919, derrick timbers were hauled to the location. During that summer the derrick was erected, and about March 18, 1920, drilling was actually commenced. The well caved in and work ceased until April, 1921, when drilling was continued for a time and then ceased until July, 1922. There was trouble with casing and tools and work ceased until in 1923. In March, 1925, gas was found. In 1920 the owner had filed a forfeiture notice of record. After reviewing an agreed statement of facts showing or failing to show use of materials and equipment, it was said:

"No continuous work was done in the meantime which could be said to connect the original efforts with the drilling operations which resulted in the gas well of 1925. Actual drilling operations on the completed well were not commenced until April, 1921, at which time it continued for only a short time, and was not again resumed until July, 1922. It was almost four years from the time that the operations should have been commenced, under the terms of the lease, until bona fide drilling operations were actually commenced." (p. 447.)

If, without regard to the surrounding circumstances, we are to hold that any act which is a step toward the drilling of an oil well is a compliance with the requirement that operations must be commenced, then the digging of the first cellar was such a compliance. Evidently the parties before us did not so consider it, for had that been true then there was no occasion to make the second agreement, for long before it was made Swearer had contracted with Western Kansas Oil & Refining Company for drilling the well, and that company had made a contract with Reynolds. Either the first cellar was dug under these contracts, or it was a voluntary venture. After the second agreement was made, Reynolds had some equipment for drilling moved to the specified location, but at that time neither he nor any of his associates had the requisite tools and equipment to drill a well. The testimony shows clearly that Swearer or his

assigns were looking for someone with adequate equipment with whom they could contract for drilling the well, and that from about July 29, 1935, when the first load of equipment was dumped, until about October 23, 1935, nothing was done, and that the well was not spudded until November 1, 1935. It may be doubted that the dumping of some usable and useful equipment on a location by one who has no intention of drilling a well himself, but expects it to be used by some one with whom he may contract thereafter for drilling of a well constitutes, in any sense, a commencement of operations for drilling of the well, but assuming that it does, and giving to appellant the benefit of every inference of the evidence adduced by him, it fails utterly to show that the "operations" so commenced were continued with due diligence to completion.

At least some of the remarks of the trial court when ruling on the demurrer are shown in the abstract. It does not appear affirmatively that it construed and gave force to all parts of the agreement of July 24, 1935. It does appear it stated it drew the inference that the first materials were placed on the location without bona fide intention of immediately proceeding with the work. Its conclusion was that doing the first thing that was necessary in order to start operations was not compliance with the terms of the escrow agreement, and that what was done was for the purpose of having a literal compliance with the terms of the contract and no compliance with the spirit of its terms, and that it did not think that what was done was the beginning of operations within the meaning of the agreement. It then sustained the demurrer.

It is quite evident the trial court's reasons were predicated on an incomplete interpretation of the agreements with reference to delivery of the leases, and that it erred in the reasons it assigned for its ruling on the demurrer, but if, in view of the whole situation. its ruling was correct, such errors as may have occurred become immaterial.

Although appellant insists that due diligence is no part of the duty enjoined upon him under the agreement of July 24, 1935, he argues that the evidence showed no lack of that due diligence, in support of which he cites *Baughman v. Ault,* 115 Kan. 553, 223 Pac. 815. Dissimilarity of facts render that case distinguishable from the one before us. Here such diligence as was shown between July 28 or 29, when the rig timbers, etc., were placed on the location, and about the date the second cellar was dug, was to find a driller with

equipment, and not to prosecute the operation started when the first materials were delivered.

We are of opinion plaintiff's evidence failed to show that he had commenced operation for drilling of a test well within the time limited and had continued the operations with due diligence to completion. He was not entitled to judgment the leases in escrow be delivered to him, and therefore the demurrer to his evidence was properly sustained.

The judgment of the lower court is affirmed.

ALLEN, J. (dissenting): These lessors stood by and watched this man drill this test well on this block of leases, and saw him expend time, labor and money over a period of months. Having brought in a well that greatly enhanced the value of the property of the lessors, they now claim a forfeiture. They do not offer to do equity by recompensing the plaintiff for the money he is out; on the contrary, they claim the benefit of this unjust enrichment. Not only that, but they make bold to ask a court of equity to reward their watchful waiting by striking down the plaintiff's property in these leaseholds and taking from him the fruits of his enterprise. To permit this seems contrary to every principle of equity and good conscience mentioned in the books. The lessors waived strict compliance with the terms of the agreement, and by their conduct should be estopped.