No. 40,573

W. F. TEMPLE, LUCY TEMPLE, MELVIN TEMPLE, J. L. TEMPLE, MAY LIVINGSTON, KATHRYN L. EMLER, CARRIE MOWREY, GEORGIA G. PATEE, HAROLD GIBSON and SOUTHLAND ROYALTY Co., (Plaintiffs), *Appellees*, v. CONTINENTAL OIL COMPANY, a Corporation, CITIES SERVICE OIL COMPANY, a Corporation, and SHELL OIL COMPANY, a Corporation, (Defendants), *Appellants*, and ARGO OIL CORPORATION, (Defendant), *Appellee*.

(320 P. 2d 1039)

Opinion filed January 25, 1958.

*Fred L. Conner,* of Great Bend, and *Richard R. Linn,* of Oklahoma City, Oklahoma, argued the cause, and *T. B. Kelley,* and *Glenn Opie,* both of Great Bend, *R. O. Mason,* of Bartlesville, Oklahoma, *Jesse M. Davis,* and *Gordon Watts,* both of Tulsa, Oklahoma, were with them on the briefs for appellants.

*Harold Gibson,* of Lyons, argued the cause and was on the briefs for appellees.

The opinion of the court was delivered by

SCHROEDER, J.: This action is brought by the landowners and other royalty owners to cancel an oil and gas lease as to a portion of a quarter section leasehold for violation of an implied covenant to develop. Defendants have appealed from a judgment in which

they were allowed a period of four months from June 29, 1956, in which to commence the drilling of an oil and gas well on the ten-acre tract in question, or in the alternative that they surrender said tract to the plaintiffs.

On March 9, 1929, the then owners executed a lease upon the Southwest Quarter of Section 24, Township 18 South, Range 8 West in Rice County. This is the tract in question in this suit. Plaintiffs have since succeeded to the original lessors' interests and defendants to the interests of the lessee. This lease was in standard form (Form 88—[Producers] Kansas) for a primary term of ten years and so long thereafter as oil or gas, or either of them, is produced from said land by the lessee. The tract is in an area known as the Geneseo Field. The first producing well was completed in this area in 1934 by defendants and there has since been considerable development in the Field.

Defendants have drilled five wells which have produced oil upon the tract in question, the first being completed on April 25, 1936, and the subsequent wells on September 23, 1936, March 5, 1941, April 23, 1941, and May 15, 1941. Defendants completed dry holes on this tract on August 7, 1940, and on February 21, 1953. The producing well which defendants completed on March 5, 1941, was permanently shut in in July of 1954. In addition, the ten acres constituting the Southwest Quarter of the Southwest Quarter of the tract in controversy were released by defendants and a producing well completed thereon by one J. L. Chew in November, 1954.

Defendants' production on the tract in question totaled 997,229 barrels of oil as of January 1, 1956, prior to the filing of the amended petition in this action on March 5, 1956. The original petition had been filed on September 27, 1955, and no production figures appear as of that date. Production from the well drilled by J. L. Chew on the tract totaled 10,635 barrels on January 1, 1956. (Chew testified that this well had paid the cost of drilling and equipping in approximately eighteen months.) Defendants also hold the leases on the other three quarters in Section 24 and have producing wells on these leaseholds. On January 1, 1956, the quarter section immediately to the east of the tract in question (the B. B. Ainsworth Lease) had produced 2,173,637 barrels of oil, and the 240-acre tract immediately to the north (the W. S. Pickerill "A" Lease), being the North Half of Section 24, except the North Half of the

Northwest Quarter of said section, had produced 1,575,702 barrels of oil.

Plaintiffs ask for cancellation of the lease as to ten acres constituting the Northeast Quarter of the Northeast Quarter of the quarter section in controversy. They contend that an operator of ordinary prudence would have drilled a well on this tract in the furtherance of the interests of both lessors and lessees.

There is a dry hole on the ten-acre location immediately west of this tract (Gibson No. 3) and a producing well on the ten-acre location immediately south of this tract (Gibson No. 5), which well had produced 191,492 barrels on January 1, 1956. On the adjacent leaseholds there have been no wells drilled on the ten-acre tracts immediately to the east, northeast or north of the tract upon which cancellation is demanded, thus leaving a forty-acre area in the center of Section 24 in which no drilling was attempted.

Plaintiffs contend that a reasonably prudent operator would have drilled a well on the ten acres in question, where there was production on the Southwest Quarter of Section 24 for a period of more than twenty years as of the date of judgment, and that defendants' failure to drill a well on this location constitutes a breach of the implied covenant to develop. Plaintiffs' evidence consists of stipulated facts, exhibits and expert testimony whereby they seek to prove that the defendants have not acted with reasonable diligence under the facts and circumstances. Defendants demurred to plaintiffs' evidence, which demurrer was overruled.

Defendants contend that they have developed the lease with reasonable diligence in doing what would be expected of an operator of ordinary prudence. To show this they submitted stipulated facts and a large number of exhibits, consisting of maps, diagrams and tabulations of data. They also produced expert testimony.

The facts heretofore stated, aside from the contentions of the parties, were taken from the stipulations of the parties. The parties agreed that the facts stipulated were true and that they "may be accepted by the court and considered as conclusive evidence of such facts," conditioned, however, on the reserved rights of the parties to object to the relevancy of any fact therein contained. They also reserved the right to offer and prove any other fact or facts not inconsistent therewith.

The nature of defendants' (appellants') attack requires that the

extent of the stipulations filed June 1, 1956, be fully disclosed. They include all of the following facts or factual material:

(*a*) Exhibit A is a plat of Section 24, Township 18 South, Range 8 West, Rice County, Kansas, and an area immediately surrounding the same one-half mile in width showing the location of all producing wells which have been drilled and all dry or abandoned wells, together with all lease names, lease operators and well numbers.

(*b*) None of the wells shown in said plat (Exhibit A) has ever produced from any formation other than the Arbuckle Limestone Formation.

(*c*) Exhibit B is a table consisting of four sheets, showing completion date, surface elevation, depth of the top of the Arbuckle Limestone Formation corrected to sea level, subsea depth to which casing was set, total subsea depth to which the well was drilled, the initial potential production of oil and water, the date of plugging and abandonment of abandoned wells, date of shutting in all wells permanently shut-in, and pertinent data and date on any recompletion, if any, of all wells shown on the plat stipulated as Exhibit A, except for dry holes (all of which were drilled to the Arbuckle Limestone Formation, but were unproductive of oil and gas in commercial quantities).

(*d*) Exhibit C is a table consisting of three sheets showing the number of surface acres and cumulative production to January 1, 1956, by lease and by well of all leases and wells operated by Continental Oil Company in the area included in Exhibit A, and cumulative production to the same date of the Chew-Gibson Well No. 1 in the Southwest Quarter of the Southwest Quarter of the Southwest Quarter of Section 24, Township 18 South, Range 8 West.

(*e*) Exhibit D is a table showing the results of the State Corporation Commission tests at various times therein shown, and the percentage of water shown to have been produced on such tests as to certain wells and leases shown on Exhibit A.

(*f*) The Arbuckle Limestone Formation of the Geneseo Field from which the property in litigation is producing is what is commonly termed a "water drive reservoir," that is, the energy which forces the oil into the well bore is the encroachment of water into the oil bearing portion of the formation as oil is produced therefrom. At the time of the discovery of the field, the oil-water contact was approximately 1,510 feet below sea level, that is, where the Arbuckle Limestone Formation was encountered above the subsea depth of 1,510 feet, it was oil bearing, and that portion of the Arbuckle Limestone Formation encountered below 1,510 feet was water bearing.

The parties further stipulated and agreed that at the trial certified copies of any records of the Kansas Corporation Commission could be introduced, subject to objection for relevancy and the right to question the accuracy; that the cumulative production of oil from any lease in the Geneseo Field not covered by Exhibit C could be shown by reference to the latest Vance-Rowe report which was to be accepted as *prima facie* proof of such cumulative produc-

tion, subject, however, to the right of any party to prove the actual cumulative production to be other than shown in said report; and that reproduced copies of any electrical log of any well purported to have been made by any service company regularly engaged in logging wells in the Geneseo Field and reproduced by any company regularly engaged in supplying the oil industry with reproduced copies of logs may be introduced in evidence without further identification, and shall be considered as a true and correct log of such well in the absence of evidence to the contrary.

The parties by additional stipulations filed June 23, 1956, agreed to other matters heretofore set out in the factual statement relative to the form and contents of the lease executed on March 9, 1929, by the then owners of the quarter section in question and delivered to J. H. Tatlock and subsequently assigned to and vested in Continental Oil Company, Shell Oil Company and Cities Service Oil Company, each being Delaware corporations. They also stipulated as to the present ownership of the lease in question and the interest of the various parties in said lease.

Defendants seek in this court for the first time to raise the question that demand was not served upon them by the lessors (plaintiffs below, appellees) that compliance with the implied covenants of the lease to develop was expected, and that they (the lessees) have not been allowed a reasonable time to comply with the alleged breach of the implied covenant. From the record it does not appear that this was presented in the lower court, nor is it specified as error on appeal to this court. Exhibits introduced by the plaintiffs at the trial disclose that on January 31, 1955, surrender of the lease on the ten-acre tract in question was requested by Harold Gibson on behalf of the plaintiffs to which William B. Beall, Division Land Superintendent, Wichita Division for Continental Oil Company, replied on February 23, 1955, as follows:

"Based on our studies, we are of the opinion that this lease has been fully developed in a prudent and orderly manner according to the terms and provisions of our basic lease.

"We appreciate your inquiry and trust you will understand our position in this regard."

On June 10, 1955, plaintiffs notified Continental Oil Company, Shell Oil Company and Cities Service Oil Company that they had not complied with the implied covenant to drill on the lease assigned to them and that the plaintiffs elected to declare the lease as to the ten-acre tract in question forfeited and void and demanded

surrender thereof within twenty days. To this Mr. Beall of the Continental Oil Company replied to Mr. Gibson by letter in the same identical wording except that the word "still" was inserted indicating that they were ". . . still of the opinion that this lease has been fully developed in a prudent and orderly manner."

Defendants contend that the plaintiffs' letter is a unilateral declaration of forfeiture and a demand to comply with statutory requirements relative to releasing of record forfeited oil and gas leases. (G. S. 1949, 55-202 and 55-206.)

Defendants rely on *Christiansen v. Virginia Drilling Co.*, 170 Kan. 355, 226 P. 2d 263; and *Tamsk v. Continental Oil Co.*, 158 Kan. 747, 150 P. 2d 326, which hold that an alleged breach of an implied covenant never results in an automatic forfeiture, that such forfeiture can only be obtained by judicial action, and that the statutory proceedings relating to the release of a forfeited oil and gas lease are not available for the purpose of declaring a forfeiture for an alleged breach of an implied covenant.

As heretofore stated, the record is not sufficient to disclose that this question was presented in the lower court. On this state of the record it does not appear that it was specified as error. Not having been specified as error the question is not subject to review on appeal. But even if it were specified and properly before the court, it does not appear from the record that defendants regarded the letters received from the plaintiffs as a declaration of forfeiture and demand, but as a notice that compliance with the implied covenants of the lease was expected within a reasonable time. The answers themselves indicate this by stating defendants' opinion that the lease was fully developed in a prudent and orderly manner according to the provisions of the lease. From this it can be inferred that the defendants had no intention to further develop the lease. The plaintiffs countered by filing an action.

The issue between the parties was framed at an early stage by the pleadings. The abstract of the record discloses that in response to a motion to elect in the lower court, the plaintiffs elected to rely upon an alleged breach of an implied covenant, and not the release of an oil and gas lease provided in G. S. 1949, 55-201, 202 and 206.

The petition alleges that there has been no attempt to further develop the lease for a period of more than two years next preceding the filing of the petition. It alleges that there are reasonable

grounds to believe that oil will be found in paying quantities under the ten-acre tract in question, and that it is apparent that this undeveloped portion of the lease is underlaid with valuable deposits of oil and will produce in paying quantities. Appellants defend by answering that said leased premises have been drilled and operated in such manner as a prudent operator would do and said premises have been developed and operated for oil and gas purposes with reasonable diligence for the mutual benefit of the lessors and lessees.

After the trial court heard all of the evidence and fully considered the case which it took under advisement, there being numerous technical maps, exhibits and stipulations, the following decision was announced:

"Now, on this 29th day of June, 1956, the Court being fully advised in the premises, finds that the implied covenant of the oil and gas lease on the premises involved has not been complied with in that defendants Continental Oil Company, Cities Service Oil Company, and Shell Oil Company have not fully developed the premises in question. The Court finds, therefore, that said defendants are allowed a period of four months from this date of June 29, 1956, in which to commence the drilling of an oil and gas well on the ten-acre tract in question, or in the alternative, that they surrender said tract in question to the plaintiffs herein."

Judgment was entered in accordance therewith. Defendants, after proper preliminary procedures appealed to this court from all adverse rulings, findings, judgments, orders and decisions. They specify sixteen errors, the bulk of which falls into two categories: (a) An attack upon plaintiffs' evidence, particularly the only two expert witnesses called to testify for plaintiffs, and (b) Technical trial errors.

The doctrine in this state is now well established that what is required of a lessee, under the implied covenant to develop an oil and gas lease, is reasonable diligence in doing what would be expected of an operator of ordinary prudence, *in the furtherance of the interests of both lessor and lessee. (Fischer v. Magnolia Petroleum Co.,* 156 Kan. 367, 133 P. 2d 95; *Myers v. Shell Petroleum Corp.,* 153 Kan. 287, 110 P. 2d 810; and *Berry v. Wondra,* 173 Kan. 273, 246 P. 2d 282.) Under this rule neither the lessor nor the lessee of an oil and gas lease is the sole judge of what constitutes prudent development of the tract. As a preliminary to further discussion herein, reference is made to the foregoing three authorities and the cases accumulated therein.

A lessor who alleges breach of the implied covenant to develop has the burden of showing, by *substantial evidence,* that the covenant has been breached. He must prove that the lessee has not acted with reasonable diligence under the facts and circumstances of the particular situation at the time. *(Fischer v. Magnolia Petroleum Co.,* supra.)

Defendants attempted to show by their evidence that there was insufficient producing formation under the tract in question to sustain a profitable well and that the encroachment of water into this area had reduced the amount of producing formation to a point where little or no recoverable oil remained under this tract. The evidence of plaintiffs and defendants was contradictory as to (1) whether sufficient producing formation remained under the tract to sustain a profitable well and (2) whether the tract was being adequately drained by existing wells on the lease.

Defendants contend that plaintiffs failed to establish, by competent substantial evidence, a breach of the implied covenant in the lease to develop. In accordance with this contention, they specify as error the overruling of their demurrer to plaintiffs' evidence.

They first challenge the qualifications of plaintiffs' two expert witnesses. Delmer L. Powers of Wichita qualified to testify for the plaintiffs in the trial court by stating that he had an A. B. degree in geology from the University of Oregon and an A. M. degree in geology from Stanford University. His profession was stated to be that of a consulting geologist and since 1938 has continuously worked as a consulting geologist in Kansas. He belongs to The American Association of Petroleum Geologists and the Kansas Geological Society. He worked as a geologist in Kansas for a number of companies, the National Refining Company, Alladdin Petroleum Company, Magnolia Petroleum Company, Union Oil of California, Kewannee Drilling Company, Sterling Drilling Company, and a great many others as a consulting geologist. He testified that he worked as a geologist in the Geneseo-Edwards pool and was acquainted with the formations therein found and was reasonably conversant with conditions in the pool.

Defendants object on the ground that Mr. Powers does not have a B. S. degree in geological engineering or in petroleum geology, both of which they contend are degrees relating to science and that the witness obviously has had no training or experience in

petroleum reservoir engineering. Defendants, therefore, contend that Mr. Powers was not qualified to express an expert opinion on the tract in litigation.

The difference between a petroleum geologist and a petroleum engineer is that the petroleum geologist is principally concerned with finding oil fields and the petroleum engineer is principally concerned with developing and producing them.

Webster's New International Dictionary, Second Edition, defines geology as: "The science which treats of the history of the earth and its life, esp. as recorded in the rocks. Geology utilizes the principles of physics, astronomy, chemistry, mineralogy, zoology, botany, etc. . . ."

We are not disposed to quibble over the nature of the degree Mr. Powers has in geology. He was educated in geology and by experience over many years in working with oil companies is qualified to testify as an expert and state his opinion on the tract in litigation, taking into consideration the foundation established in the record before this court. (*Denver v. Railway Co.*, 96 Kan. 154, 150 Pac. 562; and *Malone v. New York Life Ins. Co.*, 148 Kan. 555, 83 P. 2d 639.)

J. L. Chew testified as an expert witness for plaintiffs. He qualified by stating that he was an oil operator for himself and was production superintendent for Herndon Drilling Company for approximately ten years. He stated that he had and the companies in which he was interested have approximately 200 producing wells in the United States, a little over 100 in the State of Kansas, and three wells in the Geneseo-Edwards pool. In November, 1954, he completed a producing well on the quarter section in controversy, located in the extreme southwest ten-acre tract on this quarter. Nothing appears in the record concerning Mr. Chew's academic education. In our opinion, taking into consideration the foundation established by the whole record before this court, J. L. Chew is qualified as an expert to express an opinion on the tract in litigation.

Having determined that the only two witnesses called by the plaintiffs are qualified as experts, we turn to the plaintiffs' evidence to determine its sufficiency as tested by the rules on demurrer. They may be summarized as follows: The court is bound to consider all of plaintiffs' evidence as true; consider only the evidence favorable to them and disregard that unfavorable to them; make not only inferences favorable to plaintiffs but all inferences possible

in their favor; and not to weigh one part of their evidence that is contradictory of another part nor to weigh any differences between their direct and cross examination. (*Hill v. Southern Kansas Stage Lines Co.*, 143 Kan. 44, 53 P. 2d 923; *Meneley v. Montgomery*, 145 Kan. 109, 64 P. 2d 550; *Shoup v. First Nat'l Bank*, 145 Kan. 971, 67 P. 2d 569; and *Haga v. Moss, Administrator*, 181 Kan. 171, 311 P. 2d 281.)

The extensive stipulations filed with the court are part of plaintiffs' evidence. Wholly aside from the testimony of the expert witnesses, these stipulations go far in proving plaintiffs' case by giving them an interpretation in accordance with the foregoing rules. The Gibson No. 5 well, production figures on which have heretofore been given, topped the Arbuckle Formation at 1,465 feet subsea level depth. This is the well located on the ten-acre location due south of the ten-acre tract upon which release is sought by plaintiffs. The No. 6 Pickerill "A" well, located due north of the Gibson No. 5 and 990 feet north of the north line of the ten-acre tract in question topped the Arbuckle Formation at 1,470 feet subsea depth. A projected straight line between these two wells would place the top of the Arbuckle Formation in the center of the ten-acre location at somewhere between 1,465 and 1,470 subsea depth. This is fortified by a similar line parallel to the one just indicated running 660 feet to the east. It joins B. B. Ainsworth No. 7 (one ten-acre location to the east of Gibson No. 5), which topped the Arbuckle Formation at 1,462 subsea depth, and the No. 8 Pickerill "A" well (one ten-acre location east of the No. 6 Pickerill "A" well) which topped the Arbuckle at 1,445 subsea depth, thus indicating an even higher top for the Arbuckle Limestone Formation to the east side of the ten-acre tract in question.

With an initial oil-water contact level at approximately 1,510 feet subsea depth, the center of the ten-acre tract in question initially had an oil bearing Arbuckle Limestone Formation between 40 and 45 feet thick. The foregoing wells are the nearest wells to the ten-acre tract in question and they are the best evidence. (*Myers v. Shell Petroleum Corp.*, supra.)

The stipulations further disclose that the extreme southwest ten-acre location was released by the defendants in 1952 to the landowners who in turn leased it and in November, 1954, a producing well was completed which topped the Arbuckle Formation at 1,484 subsea depth. This well is known as the Chew-Gibson No. 1, pro-

duction figures having heretofore been stated. The well on the ten-acre location immediately to the east of Chew-Gibson No. 1 is Gibson No. 6 which topped the Arbuckle Formation at 1,475 subsea depth. It was completed as a producing well on May 15, 1941, and had produced 170,053 barrels of oil as of January 1, 1956.

The ten-acre location immediately to the south of Chew-Gibson No. 1 is Kimple No. 9. This well topped the arbuckle at 1,489 feet subsea depth and was completed on June 3, 1953. As of January 1, 1956, this well had produced 22,967 barrels of oil. This well is flanked 660 feet on the west by Raymond-Pettyman No. 1, which was completed on January 28, 1953, and topped the Arbuckle at 1,496 feet subsea depth. The initial potential of this well was 365 barrels of oil and 65 barrels of water, but in November, 1953, was permanently shut-in with a cumulative production to that date of 6,026 barrels. Kimple No. 9 is also flanked to the east by Kimple No. 8, which topped the Arbuckle at 1,484 feet and was completed as a producing well on April 12, 1941. As of January 1, 1956, the cumulative production on this well was 192,881 barrels. The initial potential of this well was 3,000 barrels of oil and no water.

B. B. Ainsworth No. 11, located 660 feet south and 1,320 feet east of the center of the ten-acre tract in question was completed as a producing well on October 25, 1954. It topped the Arbuckle at 1,408 feet subsea depth. As of January 1, 1956, this well has produced a cumulative total production of 12,374 barrels. This well is flanked on the west by B. B. Ainsworth No. 7 which topped the Arbuckle at 1,462 feet. This well was completed March 16, 1941, and as of January 1, 1956, had produced 161,346 barrels of oil. The B. B. Ainsworth No. 11 is also flanked on the east by B. B. Ainsworth No. 6 which topped the Arbuckle at 1,406 feet, where a well was completed on January 27, 1941, with an initial potential of 3,000 barrels of oil. B. B. Ainsworth No. 11 is also flanked on the north by B. B. Ainsworth No. 5 which topped the Arbuckle at 1,412 feet subsea depth. This well was completed on October 26, 1940, with an initial potential of 3,000 barrels of oil and no water, and as of January 1, 1956, had produced a total of 177,732 barrels of oil.

J. L. Chew drilled the Chew-Gibson No. 1 and testified that it had an allowable production of 25 barrels per day and it has been producing that amount. He stated its cost to be $30,000.00 to $32,000.00 to drill, equip and connect the well to the pipe line which is located on the quarter section here in controversy approxi-

mately 100 feet from the ten-acre tract in question in this suit; and that the costs of this well were recovered in approximately 18 months. Based upon his knowledge and experience as an expert in the development and production of oil and gas, and his personal knowledge and experience with the lease on the quarter section here in controversy, J. L. Chew expressed an opinion that oil could be produced from the ten-acre tract in question with reasonable expectations that it would be produced therefrom in paying quantities.

Plaintiffs' other expert witness, Delmer L. Powers, referred to a publication entitled "Structure of Typical American Oilfields, 1948," published by The American Association of Petroleum Geologists (Volume 3). The subject therein material to this action was entitled "Geneseo Uplift of Rice, Ellsworth and McPherson Counties, Kansas." Pages 235 to 238, incl., were admitted in evidence over objection, and will be referred to as the Geneseo Uplift exhibit. Defendants agreed that these pages were prepared by three geologists then employed by and members of the geological staff of Continental Oil Company in 1946. It was delivered as a paper at a meeting in Wichita, Kansas, in 1947, and published in 1948 as heretofore stated. Acceptance of this evidence over objection was specified as error by defendants. They contend that it is too remote in time even if it be regarded as an admission.

In the Geneseo Uplift exhibit is a contour map (Fig. 9 Geneseo Field, page 237) showing structure contours on top of the Arbuckle Limestone Formation at intervals of 25 feet for the Southwest Quarter of Section 24 in this litigation. It shows a contour line 1,475 feet subsea depth extending diagonally from the No. 6 Gibson well to the southwest corner of the ten-acre tract in question in the northeast corner of said quarter section and leaving the ten-acre tract near the center of the north line of said ten-acre tract. It then extends due north and slightly to the west of the No. 6 Pickerill "A" well.

The depth of the top of the Arbuckle Formation under the ten-acre tract in question was a vital point in plaintiffs' case. Mr. Powers' reference to the Geneseo Uplift exhibit corroborated his opinion as to the thickness of the oil bearing Arbuckle Formation on this ten-acre tract. He characterized the 1946 contour map as follows:

". . . I think the map as shown here by the Continental geologist is quite reasonable, and since there have been no nearer wells to the tract under consideration, since the map was made, I think that was a fair representation. I think that datum elevation, 1475, or something like that, was reasonable in view of the facts. . . ."

In our opinion the Geneseo Uplift exhibit was admissible and entitled to some weight as corroborating the views expressed by plaintiffs' witnesses respecting failure of the defendants to develop the lease with reasonable diligence under the existing facts and circumstances.

Defendants rely upon *Stanolind Oil & Gas Company v. Sellers,* 174 F. 2d 948 ( C. A. 10th Circuit, 1949; Certiorari denied, 338 U. S. 867, 70 S. Ct. 141, 94 L. Ed. 531), where it was held among other things that the testimony of an expert witness as to the contents of scientific articles dealing with geological data pertaining to the field was hearsay and improperly received in evidence because the witness merely repeated what the numerous authors told him in their articles. They also rely on *Reed v. Barlow,* ( Texas Civil Appeals) 157 S. W. 2d 933, where the opinion of an expert was held to be without value and inadmissible on the ground that records of electrical surveys or logs of completed wells, and reports of oil scouts and others, upon which the expert based his opinion in part, were not in evidence or otherwise authenticated, and were therefore hearsay for purposes of that particular trial.

A careful study of the record before this court does not disclose the situation presented by the foregoing cases. Extensive stipulations of fact were before the court and available to the witnesses in this case. Both of plaintiffs' expert witnesses had experience in the Geneseo-Edwards pool.

The following is an extracted portion of the Geneseo Uplift exhibit:

"The field is on the most prominent anticline on the uplift. Figure 8 presents the structure as mapped on a shallow marker near the horizon of the Herington limestone; Figure 9 shows the much more pronounced deformation of the Arbuckle limestone producing zone. Accumulation in the Arbuckle limestone is above a fairly uniform original oil-water contact at an elevation of −1,515 feet; and the crest of the structure is at an elevation of −1,390 feet, leaving a maximum thickness of 125 feet of Arbuckle within the oil column. Effective producing thickness is commonly less than the total in the oil column but is presumably proportional to it. The producing zones are generally finely crystalline, finely porous, brown-stained, oil-saturated zones ranging from a few inches to more than 10 feet in thickness. They are separated by zones

of dense gray dolomitic limestone so impervious as to show no trace of oil-staining. The producing zones are erratic in occurrence in the section and cannot be correlated from one well to an adjacent one. The reservoir space presumably represents secondary porosity developed through solution by circulating ground waters moving initially along joint cracks and bedding planes during the Mississippian-Pennsylvanian hiatus. In the northwest part of the field there are evidently some relatively large channels developed within the reservoir rock as there are several wells which show marked interference effects.

"Two wells have shown for commercial production in a locally developed sand in the Simpson formation on the east flank of the anticline; and porous zones in the Lansing-Kansas City limestone on the crest of the fold have shown sufficient saturation to indicate that some additional oil can probably be recovered by recompletion of existing wells as they become depleted in the Arbuckle.

"The field now includes 201 wells which have produced 18,668,429 barrels to date. Ultimate production is estimated at 32,000,000 barrels, leaving an indicated reserve of 13,331,571 barrels. The oil is almost black, contains insufficient gas to flow the wells at inception, and has a characteristic odor of hydrogen sulphide. Its specific gravity is approximately 33° A. P. I. gravity.

"Development was initiated on a 10-acre well-spacing pattern, but was carried on at a conservative rate. The adoption of statewide 20-acre spacing and later the imposition of Federal 40-acre spacing rules prevented full completion of the original development program.

"Working interests in most of the leases in the field have been pooled in one of three units, all operated by the Continental Oil Company. . . ."

Based upon his knowledge and experience, taking into consideration the stipulated facts as corroborated by the Geneseo Uplift exhibit, Mr. Powers expressed his opinion as an expert. In his opinion the ten-acre tract in question has good possibilities of producing oil commercially. He testified that a prudent operator would have drilled additional wells since all of the available ten-acre locations in the quarter section with oil bearing Arbuckle Formation have not been drilled. In Mr. Powers' opinion a producing well on a ten-acre location did not drain the oil from the Arbuckle Formation on an adjacent ten-acre location where no well had been drilled. He cited the foregoing facts summarized from the stipulations to show that wells drilled on such vacant locations in the vicinity of the ten-acre tract in question in 1953 and 1954, which were flanked by producing wells since the early 1940's, were completed as commercially producing wells.

Giving the plaintiffs' evidence the inferences to which it is entitled on demurrer, it establishes that the ten-acre tract in question has an oil bearing Arbuckle Limestone Formation 40 to 45 feet in thickness over the initial oil-water contact level of 1,510 feet

subsea depth; that no well has been drilled by defendants on this location at any time; that oil production from other wells on the lease has not caused water to rise to any appreciable degree in the Arbuckle Formation on this location; and that oil can be produced by drilling a well on this location with reasonable expectations that it would be produced therefrom in paying quantities commercially. We have no difficulty in concluding that the demurrer to the evidence was properly overruled.

Defendants specify as error many rulings of the trial court on the admission of testimony and other evidence adduced by plaintiffs from the two expert witnesses of plaintiffs. Obviously, defendants did not like their testimony and many of the objections raised have no merit. Other objections to the admission of evidence, which have been specified as error, are technical and it does not affirmatively appear that they have prejudicially affected the substantial rights of the defendants. ( G. S. 1949, 60-3317, and cases cited thereunder.) True, plaintiffs' witnesses were not possessed of all the technical facts and information which defendants' witnesses had available to them, but this did not disqualify them as experts. The result of this situation was, that upon cross examination some of the testimony of plaintiffs' witnesses was weakened or discredited. One such instance concerned the existence of producing formations other than the Arbuckle on the quarter section in controversy. After the case was tried no evidence remained upon which this fact could be established. This was not an issue of vital importance. The significant producing formation in this lawsuit is the Arbuckle Limestone.

Seventeen pages of defendants' brief have been devoted to the hypothesis of facts used by counsel for plaintiffs in asking questions of plaintiffs' expert witnesses. These hypothetical questions, answered over defendants' objections, were not technically accurate in all respects and could have been more artfully worded. Some of the questions asked for ultimate conclusions which were strictly the function of the trial court to determine, but subsequent questions based upon the same hypothesis of facts properly elicited opinion testimony in direct support of such conclusions. It is presumed that the trial court, hearing this equitable action, properly understood the law and ignored the conclusions, since it had proper opinion testimony and other evidence upon which to base its own conclusions as to whether there had been a breach of the implied covenant to develop.

Hypothetical questions put to an expert witness should be based upon the evidence, and should not assume the existence of matters, material to the formation of a correct opinion, about which no testimony has been given. (*Davis v. Insurance Co.*, 59 Kan. 74, 52 Pac. 67.) Such questions should be based upon only such facts as the evidence tends to prove, and if as to any material hypothesis, such question is without the support of the evidence, it should be excluded. It may not be required that the question be based upon the conceded facts, nor that it embrace all the facts concerning which there is evidence; neither is technical accuracy required in the framing of the question, but no material exaggeration or perversion of facts assumed is permissible. (*Commercial Travelers v. Barnes*, 75 Kan. 720, 90 Pac. 293; *Wingfield v. McClintock*, 85 Kan. 452, 453, 116 Pac. 488; and *Pierce v. Pierce*, 145 Kan. 14, 64 P. 2d 576.)

It is generally held that when an expert witness has personal knowledge, or has had personal observation, and his opinion is sought, a hypothetical presentation is unnecessary, and he may be examined as an expert witness by direct interrogation, although, preferably, it may be based upon hypothetical questions. (*George v. Shannon*, 92 Kan. 801, 142 Pac. 967; see annotation, 82 A. L. R. 1338.) It is not fatal to a hypothetical question that it includes the personal knowledge of the expert witness when the extent of that knowledge is proved, so that the actual basis of the witness's opinion is in fact disclosed. (*Currey v. Robinson*, 92 Kan. 117, 139 Pac. 1023.)

In *Telegraph Co. v. Morris*, 67 Kan. 410, 73 Pac. 108, it was stated:

". . . It is true that where an expert witness has made it manifest that he is acquainted with all of the facts upon which an expert opinion is to be based, and such facts are fully disclosed, easily understandable, and undisputed, they may be made a basis for a question calling for the expression of an expert opinion, without again arraying them in the form of a hypothetical question. This would be so because such facts could be easily grasped by the jury, and availed of by the other party in presenting a hypothetical question to another witness . . ."

Without detailing the facts recited, in general terms the hypothesis of facts directed attention to the length of time the lease had been in force; the number of producing wells drilled on the lease in 1941 or prior years with one abandoned, all drilled on ten-acre locations; a dry hole drilled in 1953; total production of oil from the lease to date; storage and pipe line marketing facilities avail-

able on the lease; release of ten acres by defendants in 1952, after refusal to drill, upon which a subsequent producing well was completed by the new lessee with production of 25 barrels of oil per day since November, 1954; and refusal of defendants to further develop the lease.

In isolation the hypothesis of facts first presented to J. L. Chew in the form of a question by counsel for plaintiffs would appear vague, but the question in its entirety must be construed under the circumstances of the record as it then stood. The stipulations were in evidence and Mr. Chew had testified as to his qualifications as an expert and his personal knowledge and experience in drilling a well on the quarter section in controversy. Under these circumstances, the assumed basis in fact upon which opinion testimony was elicited was clear to the trial court, to counsel for the defendants and to Mr. Chew. The witness fully understood that the opinion sought of him as an expert in oil and gas development was to be founded upon all the personal knowledge and experience which he possessed concerning the Geneseo pool and the lease on the quarter section here in controversy, in addition to other facts which the stipulations disclosed and which the other evidence tended to prove as set forth in the hypothesis.

No purpose would be served by detailing the various individual facts set forth in the hypothesis and the contentions of the defendants with respect thereto. The defendants attempt to divide the hypothetical question into its various component parts and conquer each individually. We construe the question in its entirety upon the facts and circumstances presented by the record and find no part of it fatally defective. In arriving at this conclusion a combination of the foregoing rules have been applied.

So long as there is no material exaggeration or perversion of facts assumed in a hypothetical question, technical accuracy in framing a question is not required. Ordinarily, opposing counsel will not be slow in cross examination of the witness to correct the hypothesis upon which the question is based if it is incorrect or deviates from the facts in the slightest degree. Hypothetical questions must be based upon facts which the evidence tends to prove, but counsel propounding the question is entitled to any reasonable theory in the interpretation of the evidence. There is no hardship or injustice in this, since opposing counsel may reframe the question upon any theory which he entertains and require the opinion

of the expert thereon. (*Commercial Travelers v. Barnes,* supra.) It is noted that counsel for defendants abandoned any cross examination of Mr. Chew concerning the hypothetical question to which they objected so strenuously and made no effort to frame any hypothetical question of their own to test the opinion of Mr. Chew.

Counsel for defendants contend that *Myers v. Shell Petroleum Corp.,* supra, broadens the Kansas prohibition against accepting expert opinion stemming from a hypothetical question whose foundation facts are lacking in necessary elements or in any other material way. The rule stated in the *Myers* case was:

"While the admission of expert testimony is for the court, and its weight is for the jury, it is nevertheless necessary that the facts upon which an expert opinion is based should afford a reasonably accurate basis for the conclusions reached, as distinguished from mere guess or conjecture." (Syl. 6.)

Defendants concede that geology is universally recognized not to be an exact science, and state "We know of no petroleum geologist who contends that he deals in the realm of finite science." The opinion in the *Myers* case said nothing concerning hypothetical questions, nor did it change Kansas law relative to the acceptance of expert opinion based upon a hypothetical question. The foregoing assertion by the defendants on the facts of this case is no more than an attempt to force upon plaintiffs the defendants' theory of the evidence.

The defendants' evidence confirms the initial existence of 112 productive acres of Arbuckle Limestone Formation on the 160-acre tract in question. Only five producing wells have been drilled by the defendants to completion and two dry holes on the entire quarter. The Gibson No. 3 topped the Arbuckle at 1,529 subsea depth and was dry. It is one location west of the ten-acre tract in question and outside the 112 acres. This dry hole has been converted to a salt water disposal well. In addition, Chew-Gibson No. 1 was completed as a producing well on ten acres released to the landowners in 1952. The other dry hole is one location north of Chew-Gibson No. 1 and topped the Arbuckle at 1,491 subsea depth. Defense is based upon the proposition that the ten-acre tract in question is fully developed in that the oil from it is being recovered by Gibson No. 5.

S. R. Cross qualified as an expert geological engineer for the defendants. He is employed by the Continental Oil Company and for five years was staff geologist with this company in the Kansas division. During this time he worked on the Geneseo pool. He

was later promoted to division geologist of the Wichita division, including all of Kansas and most of Nebraska, and has since March, 1956, been assistant regional geologist for the central region. It was Cross who advised the defendants to release the ten acres on which the Chew-Gibson No. 1 well was drilled to completion. Cross testified that he had nine years' experience with the Gibson lease in the Geneseo pool and prepared a contour map (defendants' exhibit 4) from the stipulated data showing the top of the Arbuckle Formation with intervals of ten feet. This contour map shows a wide bulge in the contour lines immediately to the north of Gibson No. 5 veering to the east around the ten-acre tract in question. From this he testified that the top of the Arbuckle Formation at the center of the ten-acre tract in question was 1,495 feet subsea depth, thus leaving only 15 feet in thickness of oil bearing Arbuckle Formation. He gave porosity of the wells in the area as approximately 10% from the top of the water table. In his opinion he would not expect more than a very small amount of oil and a large percentage of water from a well on the ten-acre tract in question. Mr. Cross said the cost of drilling and equipping a well on the location would be approximately $35,000.00 and it would cost about $250.00 a month to operate the well if production was found.

The Geneseo Uplift exhibit indicates contour lines evenly spaced and northeasterly in direction at the Chew-Gibson No. 1 location, but defendants' exhibit 4 shows contour lines around this location. Mr. Cross explains the production of oil from Chew-Gibson No. 1 by saying there is a small separate closure in which you could expect to produce oil at a lower datum than you could in the other areas of the field. In the opinion of Mr. Cross Continental should not drill a well in the ten-acre tract in controversy.

The other expert witness of the defendants is P. T. Amstutz, who qualified as a consulting petroleum engineer with a degree in petroleum geology. He specialized in Arbuckle Limestone wells. This witness prepared an exhibit showing a cross section of the Arbuckle Formation vertically running due north and south through Gibson No. 5 well. He gives the producing formation under the ten-acre tract in question as 15 feet in thickness. His testimony consists largely of an explanation with maps showing how water has moved into the formation as oil was pumped out. In his opinion there is not economic oil to be recovered from the ten-acre location in question which would not be otherwise re-

covered by existing wells. He further states that water has moved into the formation far enough that the location in question is now obviously without the productive area of the pool, since the water drive mechanism gradually decreases the size of the oil reservoir as water moves up structure. His explanation is that the water flushes the oil out of the lower formation as the water rises and any appreciable economic recoverable oil in the location in question will be produced by wells already drilled.

To substantiate his theory Mr. Amstutz testified that there was initially a total of 4,149 acre feet of productive Arbuckle Formation under the 112 productive surface acres, including that now attributed to the Chew-Gibson well. He related that the Continental-Gibson wells have produced 997,229 barrels, as shown by the stipulated data, and that portion of the reservoir contained 3,677 acre feet of the total under the lease. According to Mr. Amstutz this means that those 3,677 acre feet have recovered to January 1, 1956, an average of 271 barrels per acre foot out of 460 barrels of stock tank oil in place in the reservoir under initial conditions, and that was roughly 59% of the oil in place, which is an expression of recovery efficiency of a water-drive reservoir and an exceptionally high figure.

Pressed on cross examination Mr. Amstutz said the ten acres in question will be drained by wells now on the Gibson lease and will *eventually* be produced, to the extent that the oil is recoverable, for the benefit of the Gibson royalty owners. He admitted that the water was not rising uniformly in all locations, otherwise, all wells at a certain level would be gone.

Defendants in cross examination of plaintiffs' witness, Chew, attempted to show his interest in the outcome of the litigation since he testified on direct examination that he was ready, financially able and willing to immediately drill for oil and gas on the tract of land involved in this suit in the event that plaintiffs recover the lease to the tract. Defendants object to Chew's cost statements stating that he does not have a salt water disposal well and other necessary items which increase the expenses of operation. We are not concerned with the expenses Chew might have. The fact remains, that defendants have a salt water disposal well on the quarter, they have all the leases in Section 24 and beyond, with a pipe line to move the oil to market within Section 24 and all the other equipment and facilities incident to production. Our ques-

tion is whether the defendants, after successful production on the lease, have fully developed and produced the lease with reasonable diligence and along such lines as are reasonably calculated to make extraction of oil from the leased lands of mutual advantage and profit to the plaintiffs and the defendants.

Nearly all the leases in this pool are owned by the defendants. Hence, the question of forcing defendants to drill by reason of off-set wells is almost impossible. Defendants own the leases on all the land adjacent to the ten-acre tract in question, and although speculative, if there is drainage to wells on an adjacent lease, the defendants are getting it and not the plaintiffs.

There is an implied covenant by the lessee, under an oil and gas lease, that the tract will be prudently developed. It is well settled that where the existence of oil in paying quantities is made apparent, as here, it is the duty of the lessee to continue the development of the property and to put down as many wells as may be reasonably necessary to secure the oil for the common advantage of both the lessor and the lessee. Failure to comply with such duty is a breach of the implied covenant and obligates the lessee. (See, *Berry v. Wondra,* supra, and cases cited therein.)

Where oil is likely to be produced in paying quantities from the undeveloped portion of the lease, the only available defense to a lessee is to prove that the oil will be produced through existing wells to the extent that it is economically recoverable. Defendants by their evidence sought to prove the existence of an effective water drive across the undeveloped portions of the lease.

The trial court heard the witnesses testify, observed their demeanor, had all the exhibits, documents and data used in the trial of the case before it as evidence, and after having fully considered the case, which it took under advisement, found that the defendants have not complied with the implied covenant in the lease to fully develop the premises in question. It thereupon gave the defendants four months to commence drilling an oil and gas well on the ten-acre tract in question or in the alternative to surrender the lease on said tract to the plaintiffs. We cannot say as a matter of law that there was no substantial evidence to support the trial court's finding. The trial court weighed the evidence of the experts as the trier of the facts and we cannot say in reviewing the evidence that the facts upon which the expert witnesses of the plaintiffs based their opinions did not afford a reasonably accurate basis for

the conclusions reached, as distinguished from mere guess or conjecture. (*Myers v. Shell Petroleum Corp.*, supra.)

Defendants contend that the trial court applied an erroneous rule of law in deciding the case. They ask, "Is full development to be the test?" Under this test defendants point out that there should be a well on each ten acres in the entire Geneseo field. We do not so construe the trial court's finding. No request was made in the lower court for findings and conclusions. The journal entry recited a general finding that there had been a breach of the implied covenant in the lease. We construe this as a general finding in favor of the plaintiffs on the evidence with a conclusion that there had not been reasonable development of the lease under all the facts and circumstances. There is only one ten-acre tract upon which cancellation of the lease is sought in this action and the judgment is strictly limited to the issue on this tract which is a part of a quarter section lease.

We assign another reason why, in our opinion, the judgment of the trial court is correct. And this reason overrides the assignment of errors specified by the defendants which we have not labored in detail. Upon the whole record presented, taking into consideration all the facts and circumstances, upon which there can be no error predicated, particularly the holding of the lease on the quarter section in controversy for more than 28 years, with production for more than 20 years from the lease totaling to date approximately one million barrels of oil produced, where admittedly the 160-acre lease initially had 112 oil producing surface acres from the Arbuckle Limestone Formation, under circumstances where the present royalty owners are one generation removed from the original lessors, and confronted with the proposition stated by defendants' own expert witness that *eventually* all the recoverable oil from the ten-acre tract in question will be produced by an existing well on the Gibson lease, we are of the opinion that the defendants have not fully developed and produced the lease with reasonable diligence and along such lines as are reasonably calculated to make extraction of oil from the leased lands of mutual advantage and profit to the plaintiffs (successors to the original lessors) and the defendants (successors to the original lessee), and by reason thereof the implied covenants in the lease to develop have been breached. A lessor is entitled to the benefit of oil produced from the lease at the time it should be produced and not at some remote period of

time in the future. The lessee is not the sole judge of what constitutes prudent development of the tract. The test is what would be expected of an operator of ordinary prudence, in the furtherance of the interests of both *the lessor* and the lessee.

There was a period in the history of the oil industry when virtually no limitation existed on the number of wells that could be drilled on a given lease. Conservation measures and state control have altered this practice to prevent waste. The present facts and circumstances presented to this court indicate the swing in reverse —*eventually* the plaintiffs will receive all the royalty payments to which they are entitled. This is not the development of an oil and gas lease contemplated by prudent development of the tract. Development of the lease was initiated on a ten-acre well spacing pattern, but was never completed on this basis. The evidence does not disclose why the original program was not completed and it may be somewhat speculative, but we take judicial notice of the fact that this country was plunged into World War II on December 7, 1941, shortly after the producing wells on this lease were completed, which brought about governmental restrictions and control in our national economy for a number of years thereafter. This era of wartime restrictions and control is now past.

The allegations of plaintiffs' amended petition are in substantial accord with those in the case of *Berry v. Wondra,* supra, including the prayer for relief. Plaintiffs' request that the lease insofar as it covers the Northeast Quarter of the Northeast Quarter of the Southwest Quarter of Section 24, Township 18 South, Range 8 West, be cancelled; that title be quieted in plaintiffs' names, as to the defendants, Continental Oil Company, Cities Service Oil Company and Shell Oil Company; and that plaintiffs have judgment for costs and such other relief against said defendants as may be just and equitable.

In the Berry case the relief prayed for was cancellation of the undeveloped portion of the lease. It was not for an order requiring further development or cancellation in the alternative, but this court had no difficulty granting alternative relief. While equity abhors forfeitures it likewise abhors injustice. (*Alford v. Dennis,* 102 Kan. 403, 170 Pac. 1005.)

The judgment of the trial court should be affirmed as hereafter modified. The trial court should enter an appropriate decree that unless the defendants herein commence a well on the ten-acre tract

here in controversy on the leased premises by the 25th day of May, 1958, and complete the same as soon as is reasonably possible, the lease as to such ten-acre tract shall be cancelled. The trial court should retain jurisdiction to see that the decree is carried out.

It is so ordered.