No. 42,227

FORREST A. STAMPER, et al., *Appellees* and *Cross Appellants*, v. JONES, SHELBURNE & FARMER, INC., et al., *Appellants* and *Cross Appellees*.

(364 P. 2d 972)

Opinion filed September 18, 1961.

*Marvin E. Thompson,* of Russell, argued the cause, and *George W. Holland* and *Clifford R. Holland, Jr.,* both of Russell, and *R. W. Tesch,* of Fort Worth, Texas, were with him on the briefs for the appellants and cross appellees.

*Stanley Krysl,* of Stockton, argued the cause, and *D. A. Hindman,* of Stockton, was with him on the briefs for the appellees and cross appellants.

The opinion of the court was delivered by

SCHROEDER, J.: This is an action to cancel oil and gas leases as to the undeveloped portions thereof for breach of the implied covenants to develop in such leases.

The principal questions presented are whether the evidence supports the findings of the trial court, and whether the findings support the judgment entered.

The plaintiffs (appellees and cross appellants) are owners of the oil, gas and mineral rights under six separate eighty-acre tracts upon which they, as lessors, executed oil and gas leases to the defendants

R 17 W

29        28

V 7

8

9 VI

1   I

2

6

IV   5

III   3   4   II

32        33

T

8

S

LEGEND

PRODUCING OIL WELLS — — — ●
ABANDONED OIL WELLS — — — ●
SALT WATER DISPOSAL WELLS — ✧
ABANDONED OIL WELLS CONVERTED
TO SALT WATER DISPOSAL WELLS — ◆
DRY HOLES — — — — — — ✧

(appellants), making them the working interest-owners. The petition sets forth each lease in a separate cause of action.

Each oil and gas lease is on Form 88 (Producers) 1-43 B, a form in common use in the Mid-Continent area, and none of the leases contains any express covenant relating to the issues in this case. In each lease the lessors reserved the usual 1/8th royalty, plus an overriding royalty of 1/32nd of the 7/8ths of the production. The one-year primary term of each lease has expired, and each lease subsists by reason of the continuation of production.

The leaseholds are located in the Dopita East Pool in Rooks County, Kansas, principally comprising Sections 28, 29, 32 and 33, Township 8, Range 17 West. Three possible producing formations underlie each of the leases in question, the Arbuckle Dolomite, the Marmaton Sand, and the Lansing-Kansas City Lime.

To assist in clarification of the factual situation, somewhat complicated by the existence of six separate leases between the same parties with production from three different formations in the Dopita East Pool, a sketch map, with legend, is reproduced. Each eighty-acre tract is numbered in Roman numerals and it corresponds with the number of the cause of action to assist in identification. (To illustrate: The lease which is the subject of the first cause of action is on the eighty-acre tract numbered "I", etc.) The wells drilled on the Stamper leases are numbered in Arabic numerals immediately above the well location.

The parties concede drainage from the tracts covered by these leases to other property is not a factor involved in this lawsuit, and production in this area is not controlled by proration.

After hearing all the evidence and taking the case under advisement upon submission of briefs, the trial court made findings of fact and conclusions of law.

The findings, after preliminary recitations heretofore indicated, read as follows:

"3. *Six oil and gas test wells have been completed as producers on the retained acreage, and each of said wells is producing oil in paying quantities at the present time,* said wells were drilled and completed as producers on the following dates and locations:

| Cause of Action | Well No. | Date of Completion | Location |
|---|---|---|---|
| 1st | 1 | 5-17-1953 | SW/4 SW/4 SW/4 of Sec. 28 |
| 2d | 3 | 12-21-1953 | SW/4 SW/4 NW/4 of Sec. 33 |
| 3d | 4 | 12-16-1953 | SE/4 SE/4 NE/4 of Sec. 32 |
| 4th | 5 | 2-24-1954 | SE/4 NE/4 NE/4 of Sec. 32 |
| 5th | 7 | 3-22-1954 | NW/4 NE/4 SW/4 of Sec. 28 |
| 6th | 9 | 9-27-1954 | NW/4 SW/4 SE/4 of Sec. 28 |

"Well No. 1 produces from the Arbuckle formation; Well No. 7 produces from the Marmaton; and Wells No. 3, 4, 5, and 9 produce from the Kansas City Lime formation.

"4. All of the six retained leases are being produced into one common tank battery which is located on the S/2 SW/4 of Section 28, with the oral consent of the mineral owners.

"5. Well No. 6 was drilled as a disposal well and Well No. 2 was a dry hole, but neither of these two wells are located on the retained leases.

"6. The only dry hole drilled on the retained leases was Well No. 8, which was a dry hole completed on the S/2 SW/4 of Section 28.

"7. The average monthly production from said leases between 1954 and 1958, when this action was commenced, was in excess of 2500 barrels of oil per month, and that the average monthly production since commencement of this action, and up to and including October of 1959, is 2400 barrels of oil per month.

"8. *The six leases have produced, up to and including October, 1959, a gross total of 202,827.03 barrels of crude oil. The six existing producing wells have produced in excess of 33,600 barrels each of oil, to date, on the average. That it is impossible to determine the exact amount each well has produced, as all wells are being produced into one tank battery, and since monthly barrel tests on each well were not commenced until about time suit was commenced.*

"9. The value of the gross production of oil from said leases, up to and including October 1959, is $553,653.00.

"10. At the end of the year 1962, said leases and the producing wells now located thereon will still, in all probability, be producing 2000 barrels of oil per month.

"11. Defendants recovered their original investment in said leases on or about April, 1957, or shortly thereafter.

"12. Defendants have realized a profit of in excess of $160,000.00 in the operation of said leases to date.

"13. *The present wells, as now located on each ,of said leases, will not adequately drain the acreage covered by each of said leases.*

"14. *There are some proven or semi-proven locations on each of the retained leases, which should have been drilled by the defendants long prior hereto.*

"15. *The proven or semi-proven locations which should have been drilled by defendants are in all probability, capable of producing a minimum of 30,000 barrels of oil each.*

"16. Demands for additional development or release of undeveloped acreage was made upon defendant operator.

"17. It would cost from $35,000.00 to $40,000.00 to drill and equip a well to be drilled on each of the proven or semi-proven locations, and *the Court finds that, in all probability, sufficient oil could be produced by each of such wells to return the operator his cost of drilling, the operation thereof, all miscellaneous expenses and provide a substantial profit for the operator in addition to paying the landowner the usual 1/8th royalty and the 1/32 of 7/8th overriding royalty retained in each of said leases to the landowners.* This profit would at least amount to, or exceed, the original investment of said operator in drilling and equipping each of said wells." (Emphasis added.)

The appellants upon the evidence concede in their brief all production was collected in and delivered from one tank battery, at an average gravity of 29.1 for which purchase was made at $2.69 per barrel.

The trial court in its memorandum opinion, which incorporated the findings and conclusions, said:

"The plaintiffs have asked that all leases be canceled. The Court has decided that that is an unreasonable request. The defendants have asked that no action be taken. This, too, the Court finds is unreasonable. This Court feels and finds that the defendants should have the right to drill additional wells, and is confronted with the question of whether or not in the case where the plaintiffs elected to try the cases as separate causes of action; that one cause of action can be in any way dependent upon the other. The Court has reached the conclusion that because that is strictly an equitable matter, and that justice cannot be rendered except by basing its decision on one cause of action upon the other, that it has that power."

Upon the foregoing assumption of power the trial court made the following conclusions of law:

"1. The above facts do not justify cancellation of any of the leases as set out in Finding of Fact No. 1.

"2. The Court finds that the defendants shall have six months to drill on the lease on the South Half of the Northeast Quarter of Section 32-8-17, as set out in plantiffs' third cause of action. If the defendants shall file an intention to drill within thirty days after date of this judgment and shall drill and complete a well thereon within six months, plaintiffs' cause of action will be denied. Should the defendants fail to file such intention to drill such a well, and fail to drill, the lease shall be ordered cancelled.

"3. Should the well as provided in the second Conclusion of Law be drilled by the defendants and be a commercial producer, the defendants are directed to drill and complete a well within six months on the South Half of the Northwest Quarter of Section 33-8-17 [Tract II] within one year from the date of this judgment. Should the defendants fail to carry out the direction of this finding, said lease shall be cancelled at the expiration of one year. Should the well be drilled as required in No. 2 and be a non-commercial well, judgment shall be for the defendants.

"4. So far as the first, fourth, fifth, and sixth causes of action are concerned, the Court finds the issues in favor of the defendants, and judgment on each of those actions are for the defendants; however, because of the question of this matter becoming *res judicata*, the Court retains jurisdiction of all of said causes of action for further hearings thereon should facts develop making this judgment improper. The purpose of this order being that the plaintiffs will not be prohibited in future actions from introducing the evidence in a future case now before this Court in this case."

Costs were divided and judgment was entered in harmony with the conclusions, except we note, in the journal entry, regarding the

First, Fourth, Fifth and Sixth causes of action, appears the recital "Provided However, that the Court shall have and retain jurisdiction of each of said causes of action for further hearing thereon, should further development be had making this portion of the judgment improper."

Post trial motions were overruled and appeal was duly perfected by the respective parties presenting the questions hereafter considered.

Was there any evidence to sustain the trial court's determination that the defendants had failed to comply with the implied covenant to develop?

The appellants contend there is no evidence to sustain the trial court's apparent determination that they are obligated to undertake additional development on the leases involved in the third and second causes of action.

Rules of law applicable to this case have been long established and were stated and applied in *Temple v. Continental Oil Co.*, 182 Kan. 213, 320 P. 2d 1039, rehearing denied 183 Kan. 471, 328 P. 2d 358. Some of the rules material to the issues in this case are the following, taken from the syllabus in the *Temple* case.

There is an implied covenant by the lessee, under an oil and gas lease, that the tract will be prudently developed, and where the existence of oil in paying quantities is made apparent, it is the duty of the lessee to continue the development of the property and to put down as many wells as may be reasonably necessary to secure the oil for the common advantage of both the lessor and the lessee. (Syl. ¶ 2.)

A lessee, under the implied covenant to develop an oil and gas lease, is required to use reasonable diligence in doing what would be expected of an operator of ordinary prudence, in the furtherance of the interests of both the lessor and lessee. Under this rule neither the lessor nor the lessee of an oil and gas lease is the sole judge of what constitutes prudent development of the tract. (Syl. ¶ 3.)

A lessor who alleges breach of the implied covenant to develop has the burden of showing, by substantial evidence, that the covenant has been breached. He must prove that the lessee has not acted with reasonable diligence under the facts and circumstances of the particular situation at the time. (Syl. ¶ 4.)

The appellants argue the language used by the court "where the existence of oil in paying quantities is made apparent" means the

existence of such oil on the undeveloped tract, and not on the portion which had been developed. This must be conceded, but the existence of oil in paying quantities on the developed tract is material evidence, when considered with all of the other evidence adduced in the case, to determine whether oil is likely to be produced in paying quantities from the undeveloped portion of the lease.

It is universally recognized that geology is not an exact science. Therefore, in cases of this type courts are concerned with probabilities or reasonable expectations. Thus, when a qualified expert witness expresses an opinion that oil could be produced from the undeveloped portion of a tract in question with reasonable expectations that it would be produced therefrom in paying quantities, it is sufficient evidence upon which to base a finding that the lessee has failed to comply with the obligation imposed by the implied covenant to develop the lease, provided the facts upon which an expert opinion is based afford a reasonably accurate basis for the conclusion reached, as distinguished from mere guess or conjecture. (Syl. ¶ 8.)

The same situation exists here as in the *Temple* case, the expert witnesses of the appellees were not possessed of all the technical facts and information which the appellants' expert witnesses had available to them, but this did not disqualify them as experts.

The evidence is undisputed that all of the oil produced from the six tracts in question was pumped into one common tank battery. No record was maintained as to the production from each well. An effort was made by the appellants to arrive at the total production for each well on the leases in question by monthly barrel tests which were first initiated about two years before the hearing. This was approximately five years after production began on these leases. On cross examination the production figures relating to each well were admitted to be *estimates.*

The appellees' evidence consisted of the expert testimony of Richard C. Findeiss, a graduate petroleum engineer from the University of Oklahoma in 1940, who had engaged in the oil business with his father. He prepared exhibits which were introduced in evidence showing the total monthly production for all six wells with the witness' interpretation of anticipated future production; a contour map showing the witness' interpretation of the Lansing-Kansas City Lime formation underlying the tracts in question; and a contour map showing the witness' interpretation of the Arbuckle Dolomite formation underlying the tracts in question.

The subsea level depths at which the various producing formations *were encountered* on the tracts in question are disclosed by these maps and by contour maps introduced by the appellants. The highest producing elevation at which the Arbuckle Dolomite was encountered is 1425 feet and 1424 feet in Stamper No. 1-C on Tract I, and Stamper No. 7-C on Tract V, respectively. The lower limit at which an operator might encounter production in this formation in the area of these leases is 1431 feet. The highest producing elevation at which the Marmaton Sand was encountered is 1387 feet in Stamper No. 7-C on Tract V. This formation was also encountered on Tract VI at 1387 feet in the abandoned well located northeast of Stamper No. 9-C. The highest producing elevation at which the Lansing-Kansas City Lime was encountered is 1141 feet in Stamper No. 4-C on Tract II. The lower limit at which an operator might encounter any production in this formation is approximately 1150 feet. This formation was described as highly erratic in that porosity and permeability is not constant in the area, with the result that wells encountering the formation at elevations as high or higher than producing wells fail to produce.

Needless to say, the elevations at which the various formations would be encountered on the *undeveloped portions* of the tracts in question vary widely on the contour maps prepared by Findeiss for the appellees from those prepared by an expert for the appellants. Findeiss gave his opinion as to the amount of production that could reasonably be expected from the undeveloped portions of the tracts in question as follows:

"The wells in this pool have already produced in excess of 30,000 barrels per well; that is average. It is my opinion these locations we have selected, these undrilled locations should produce at least as much if not more than the wells that have already been drilled and are producing on the average."

He further testified:

"At present time there is just one well on each eighty acres. They are on ten acre spacing, and definitely in this territory in Rooks County they have all been developed on at least twenty acre spacing. In the immediate vicinity there have been nine spot locations drilled. I do not think this area is any different from those in the adjacent area, which it has been shown that certainly less than the eighty acre locations are necessary to drain this pool.

. . . . . . . . . . . . . .

"I think in order to drain oil from underneath this Arbuckle high or Kansas City, different Kansas City Zones, you will have to drill 20 acre locations eventually to complete drainage of it. The first Dopita wells were drilled on the basis of 40 acres. That was done because of shortage of material during

the war. After that they came down and drilled 20 acre locations. They drilled nine spot locations through the Continental Oil and Shell Oil Company. That was on the basis of 17.7 acres. I think 80 acres could not be drained by one well should the formation be productive underneath the entire eighty."

The appellants concede if there is any evidence to sustain the trial court's findings, such findings must be affirmed on appeal. Their position, however, is that on cross examination the testimony of Findeiss disclosed the foregoing opinion was unworthy of credence, because average production was used as the basis upon which Findeiss gave his opinion. It is argued the witness was offering his opinion without any facts to afford a reasonably accurate basis for the conclusion reached because he had not ascertained what the production was from each producing well. (See, *Myers v. Shell Petroleum Corp.*, 153 Kan. 287, 110 P. 2d 810, Syl. ¶ 6.) The appellants contend the burden of proof cast upon the appellees "was not discharged by assuming, contrary to known facts, that each well had produced the average of six wells, and then building upon that assumption, the further assumption that the undeveloped acreage would produce the assumed average amount."

If the court were to recognize this as a valid argument on the facts presented by the evidence in this case, it would permit an operator of oil and gas leases to avoid the implied covenant to develop merely by pumping all wells into one common tank battery. By their own conduct in operating these leases the appellants are in no position to be heard regarding the foregoing argument. *On the facts in this case* average production is acceptable to show the existence of oil in paying quantities on the undeveloped portion of a given lease in this action. It has been said the nearest wells to an undeveloped portion of a lease are the best evidence to ascertain whether oil is likely to be produced in paying quantities from the undeveloped portion of the lease. (*Myers v. Shell Petroleum Corp.*, supra; and *Temple v. Continental Oil Co.*, supra.)

Findeiss testified that he knew each individual well had not produced the average amount of oil, but said "we have no way of testing all the various zones and know what any of the wells will produce. I don't believe there is any way, since all the zones have not been checked in each well."

On cross examination as to each tract and formation Findeiss gave his opinion where a given oil-bearing formation would be encountered, but declined to give an opinion as to whether it would

be commercially productive, or how much production might be obtained. The witness had previously given his opinion based upon facts heretofore stated, but counsel for the appellants sought to press the witness for an exact determination whether a given formation would produce commercially. Upon the facts and circumstances here under consideration this would not be controlling, since there are three producing formations to contend with under each tract.

The trial court, after overruling the appellants' demurrer to the appellees' evidence, heard the appellants' evidence, and was entitled to rely upon it to the extent that he felt it merited consideration in making his findings.

Evidence of the appellants as to the wells on the tracts in question disclosed Stamper No. 1-C (See Sketch) on Tract I was completed as a producer on May 17, 1953, in the Arbuckle Dolomite at 1425 feet. (Note: All elevation figures given in this opinion are subsea level depths.) As of October 1, 1959, the well had recovered approximately 66,600 barrels of oil, representing 33% of the total production on the six leases. (All production figures are admitted to be estimates for the reasons heretofore stated.) No other formation has been tested on this well which is still pumping from the Arbuckle formation.

On the same tract Stamper No. 8-C encountered the Arbuckle fifty feet lower than in the No. 1 well and was dry. It encountered the Lansing-Kansas City Lime at 1148 feet and failed to produce.

Stamper No. 6-C on the eighty-acre tract south of Tract I was dry in all formations, but is being used for salt water disposal purposes by the appellants on their Stamper leases and other leases in the area under separate contract with the appellees. It encountered the Lansing-Kansas City Lime at 1143 feet and the Arbuckle at 1437 feet, twelve feet lower than the No. 1-C.

Stamper No. 2-C on this same eighty was dry in all formations, encountering the Lansing-Kansas City Lime at 1144 and the Arbuckle at 1438 feet.

A direct west offset to Stamper No. 1-C is a Murfin-Stamper well which encountered the Arbuckle at 1431 feet without production, but produced approximately 21,000 barrels of oil from the Lansing-Kansas City Lime, encountered at 1149 feet, before being plugged and abandoned.

Stamper No. 7-C on Tract V was completed April 23, 1954, as a producer in the Arbuckle at 1424 feet, and produced for thirty

months, recovering approximately 24,000 barrels of oil, and upon the depletion of that formation, was recompleted in the Marmaton Sand at 1387 feet, from which formation it had recovered 20,400 barrels of oil in thirty-four months to October 1, 1959, with a combined production of 22% of the total production of the six leases, and was still producing at the time of the trial.

Stamper No. 9-C on Tract VI encountered the Arbuckle at 1434 feet and was nonproductive. It is producing from the Lansing-Kansas City Lime, encountered at 1157 feet. Up to October 1, 1959, it had recovered 29,260 barrels of oil representing 13.3% of the total production of the leases. The well was originally drilled and production casing set July 23, 1954, by another operator and lessee, who determined to abandon it. The appellants purchased it for the cost of the pipe, and produced it for 59 months to October 1, 1959, and at the time of trial it was still producing.

A northeast offset from No. 9-C on the same tract encountered the Arbuckle at 1443 feet and the Lansing-Kansas City Lime at 1152 feet and was nonproductive in these formations, but was productive in the Marmaton Sand for a while at 1387 feet until it was abandoned.

The appellants completed Stamper No. 5-C on Tract IV as a producing well in the Arbuckle on June 4, 1954, encountered at 1431 feet. It produced approximately 4500 barrels from the Arbuckle in ten months to deplete the formation, and was plugged back to the Lansing-Kansas City Lime, encountered at 1145 feet, from which approximately 24,386 barrels had been recovered to October 1, 1959, with a combined production of 14.3% of the total production of the six leases.

On January 8, 1954, appellants completed Stamper No. 3-C on Tract III as a producing well in the Arbuckle, encountered at 1427 feet. It recovered approximately 5,000 barrels of oil from the Arbuckle in ten months at which time such formation was depleted, and the well plugged back to the Lansing-Kansas City Lime, encountered at 1143 feet, from which it had recovered 11,160 barrels of oil up to the time of trial, making a combined total production of 8% of the total production from the six leases. The initial potential of this well in the Arbuckle was 149 barrels of oil per day.

A direct south offset to No. 3-C is The Petroleum, Inc.—Brown E-1, which was productive in the Arbuckle, encountered at 1426 feet, but which had been plugged and abandoned at the time of

trial. The Petroleum, Inc.—Brown E-1 B well, located about 50 feet northeast of the E-1, produced from the Lansing-Kansas City Lime at 1141 feet, recovering 8,400 barrels of oil before being plugged and abandoned. The Lansing-Kansas City Lime was encountered at the same depth in E-1 but was dry.

On January 15, 1954, the appellants completed Stamper No. 4-C on Tract II as a producing well in the Lansing-Kansas City Lime, encountered at 1141 feet. This well was nonproductive in the Arbuckle, encountered at 1432 feet. It had an initial potential of 109 barrels of oil per day and at the time of trial was still producing. As of October 1, 1959, this well had recovered about 19,000 barrels of oil, representing 9.4% of the total production from the six leases.

A direct offset to the south is McMullen No. 2, which was productive in the Arbuckle at 1423 feet, and after depletion in that formation, was plugged back to the Lansing-Kansas City Lime, encountered at 1142 feet, from which formation it was producing at the time of the trial.

John O. Farmer, one of the appellants, testified as an expert for the appellants. He is engaged in the drilling for, and production of, oil and gas. Beginning in 1947 he was associated in the firm of Jones, Shelburne & Farmer, engaged in such business, which company is now known as John O. Farmer, Inc., of which he is president. He testified that in his opinion a prudent operator would not undertake to drill the locations designated by the appellees' witness Findeiss, on the undeveloped portions of the leases in question, because at this time the price of oil and the cost are such that the operator would not "expect to get a return that is in line with good and accepted business practice."

Mr. Farmer had previously testified that taking into consideration the risk of drilling dry holes and cost of drilling, equipping and operating a well, and the geological factors a reasonable and prudent operator must be able to anticipate a minimum recovery of three to one. That is, three dollars return for one invested. On the same point he said it was generally recognized in the industry that an operator should get three times his investment cost back in from nine to ten years. He testified the cost of drilling, equipping and completion of a well in this area would be around $42,000 to $45,000, exclusive of a tank battery. Other expert witnesses for the appellants on costs gave figures ranging from $35,000 to $45,000 total costs for an original well.

As to the Stamper wells on the tracts of land in question, other than Stamper No. 7-C, Mr. Farmer testified the Marmaton Sand had not been tested as far as perforating is concerned. On this formation it was his opinion that:

"There is possibly some production, and we will eventually try to get some out of it, but it is definitely marginal. We don't anticipate great recoveries. It will be wind falls."

The appellees' witness Findeiss testified a commercial well would be one which produced enough oil to pay back the money the operator had expended plus a reasonable profit. He knew of no formula as to profit that would satisfy a "reasonable, prudent operator." (See, *Temple v. Continental Oil Co.*, supra, Syl. ¶ 3.)

The appellees called two witnesses, who were defendants below, to testify. They were S. J. Peavey and Harlan Miller. The two had purchased the Stamper leases here in question and turned them to the appellants, retaining an overriding royalty. Both were engaged in the oil business which consisted of owning royalty interests, overriding royalty interests, working interests and as lease brokers. Over objection they were permitted to testify that they knew the costs of drilling and equipping a well in the vicinity, and in their opinion a prudent operator would have drilled additional wells upon the six leases in question. They recognized that if the leases in question were cancelled by the court, they would lose their overriding interest.

The appellees introduced a letter written by Mr. Farmer. It reads:

"JOHN O. FARMER, INC.
Oil Producers and Drilling Contractors
RUSSELL, KANSAS
February 21, 1938 [1958]

Forrest Stamper
Plainville, Kansas
    RE: Further Development
        Stamper Leases
        T 8 S-R 17 W
        Rooks County, Kansas

Dear Forrest:

We are in receipt of a letter from Hindman and Krysl requesting that we either do additional drilling on our Stamper Leases or release the undeveloped acreage.

Some time ago I had our engineers make a study and prepare a report on these leases, one copy of which is attached. As you will note we have

recommended that additional drilling be done on this acreage. Copies of this report have been sent to our associates and we are awaiting their reply to our recommendation.

Just as soon as I have heard from our partners, I will advise you of our intentions.                                                Yours very truly,

JOHN O. FARMER, INC.
/s/ John O. Farmer
John O. Farmer

JOF/lk"

Mr. Farmer testified the engineering study mentioned in the letter disclosed locations on the eighty-acre tract lying immediately south of Tract I. The appellants contend the letter does not disclose whether a prudent operator would have drilled on the leases in question. It must be observed the appellants did not have the lease on the eighty lying south of Tract I on the date the letter was written, the primary term of one year having expired without production, and the letter makes specific reference to the Stamper leases. The probative value of this testimony of Mr. Farmer and of the letter was a question for the trial court to determine, when considered in connection with all the other evidence adduced in the case.

The findings of the trial court which the appellants challenge are Nos. 13, 14, 15 and 17, heretofore quoted. These findings are specific and apply to each cause of action. They are adverse findings to the appellants on each cause of action. Taking the evidence presented by the entire record into consideration, we think there was substantial evidence to support all of the "Findings of Fact" made by the trial court. In arriving at this conclusion those portions of the evidence most favorable to the appellees, and which tend to support the findings, have been presented in the foregoing discussion of the case. (The evidence on findings which are uncontroverted has not been set forth.)

Did the trial court err in failing to restrict its decree of alternative cancellation to the undeveloped acreage specified in the pleadings?

The foregoing question relates directly to one of the appellants' specification of errors. An answer, however, requires some explanation of the pleadings.

In the petition the appellees requested cancellation of each lease, except as to the ten-acre tract upon which the producing well was located. The trial court upon motion of the appellants ordered the appellees to make their petition definite in certain respects, but

the appellees in complying therewith amended their petition by going beyond the court's requirement and designated the portion of each lease where they thought an additional well or wells should have been drilled. (These portions of each lease are designated by hatch marks on the sketch heretofore set forth.) Actually, these allegations were surplusage and the appellees were not limited to such locations in their proof as the petition stood at the time of trial. This was the holding of the trial court, and we fail to see how the appellants were prejudiced by such ruling. It is therefore proper for the trial court to decree alternative cancellation for each lease, except the ten-acre tract upon which the producing well is located.

Did the trial court err in retaining jurisdiction for further hearing on the leaseholds involved in the First, Fourth, Fifth and Sixth causes of action?

The appellants contend the only consistent interpretation of the apparent conflict in the court's conclusions of law is, that breach of the implied covenant by the appellants was established as to the leaseholds covered by the Third, and possibly, Second causes of action, but that such breach was not established as to the remaining causes of action.

The appellees on the other hand contend the findings of the trial court are inconsistent with the conclusions concerning the First, Fourth, Fifth and Sixth causes of action; and that upon the findings of fact they are entitled to cancellation or additional development of the leases described in these causes of action. This point is well taken.

The trial court in its memorandum opinion assumed that it had power, this being an equitable matter, to consider one cause of action as being dependent upon another—that the decision on one tract could be made dependent upon another. This was an erroneous assumption.

While this lawsuit does involve the same lessors and lessees as parties, each lease was separate and distinct from any other in its terms, and was made the subject of an independent cause of action. Neither the fact that the parties are the same, nor the fact that the tracts of land covered by the leases in question embrace oil-bearing formations comprising a common source of supply, alter the independent legal nature of the leases in question or make them dependent upon one another. Furthermore, the confusion caused in

this case by collecting all of the oil produced from the six leases into one common tank battery, without the maintenance of individual production records for each well, has not effected a merger of these leases. In other words, the appellants' choice as to the manner in which these leases were operated has not altered their obligations under each individual lease.

To extend the rights and obligations of the parties to a contract, such as a lease, beyond the specific undertaking would be no less than the impairment of the obligation of contract, contrary to fundamental concept in our society. It is basic to the ownership of real property, which includes mineral interests in land, that the owner be free to contract with respect to such property. The owner of a large tract of land is free to make each eighty-acre tract, or a lesser amount, in which he owns the mineral interests the subject of an independent oil and gas lease, and each one carries with it independent rights and obligations, including the implied covenants. Recently the court said in *Renner v. Monsanto Chemical Co.,* 187 Kan. 158, 354 P. 2d 326:

"In evolving the doctrine of implied covenants courts have placed *great emphasis on individual property rights* and construed oil and gas leases 'to promote development and prevent delay' upon the theory that the lessor had the right to have his land developed as rapidly as possible . . ." (p. 167.) (Emphasis added.)

The very purpose in dividing one's real property into eighty-acre units for leasing purposes is *to assure development of each unit.* Thus production on one lease could not hold another lease beyond the primary term in the absence of independent development or production on such other lease. The same is true of the implied covenant to develop. (See, *Renner v. Monsanto Chemical Co.,* supra.) One lease covering an eighty-acre tract of land is in no way dependent upon a lease on another eighty-acre tract of land, even though it may join, or lie adjacent thereto, or involve the same parties, absent a binding agreement between the parties making such leases interdependent.

The parties in this case were free to bargain for the oil and gas leases on the eighty-acre tracts of land in question. If the lessees were unwilling to assume the obligations of six independent leases (actually seven, the primary term of one expired, no oil having been found), they should have asserted their objection by refusing to enter into such contractual obligations. Nevertheless, the lessors

prevailed at the bargaining stage of the case and six (actually seven) independent leases resulted and thereby fixed the parties' rights and obligations.

On the facts here presented one cause of action is no way dependent upon the other. Each must be treated as an independent lease. The trial court made findings relative, to each of the leases which in substance determined that the lessees had failed to develop each of the leases in accordance with prudent development. In other words, the trial court found the existence of oil in paying quantities was made apparent on the undeveloped portion of each tract covered by *each lease,* and it was the duty of the lessees *to continue the development of each tract* and put down as many wells as may be reasonably necessary to secure the oil for the common advantage of both the lessor and the lessee; that the lessees had not used reasonable diligence in doing what would be expected of an operator of ordinary prudence, in the furtherance of the interests of both the lessors and lessees on each of the six tracts.

The trial court said it would be unreasonable to cancel each of the leases, and likewise found that it would be unreasonable to take no action as requested by the appellants (defendants below)— that the appellants should have the right to drill additional wells. The foregoing findings and general conclusions of the trial court are within the evidence and determine the issues in this lawsuit.

Here the appellees sought cancellation of the undeveloped portions of each of the leases, but this does not preclude the granting of alternative relief. In *Temple v. Continental Oil Co.,* supra, it was said:

"In the Berry case the relief prayed for was cancellation of the undeveloped portion of the lease. It was not for an order requiring further development or cancellation in the alternative, but this court had no difficulty granting alternative relief. While equity abhors forfeitures it likewise abhors injustice. (*Alford v. Dennis,* 102 Kan. 403, 170 Pac. 1005.)" (p. 236.)

The judgment of the trial court as to the Third cause of action is affirmed (subject to modification by the trial court as to the time of drilling and completion of a well), but as to all other causes of action the judgment is reversed, with directions to enter judgment in the alternative for the appellees on each of these causes of action (Second, First, Fourth, Fifth and Sixth) as the trial court may equitably determine proper, viewing the lease on each tract of land independent of the lease on any other tract.