234 Kan. 994 (1984)
677 P.2d 991
CLEON PARKIN, et al., Appellants,
v.
THE STATE CORPORATION COMMISSION OF KANSAS, et al., Appellees.
No. 55,693
Supreme Court of Kansas.
Opinion filed February 18, 1984.
Gordon Penny, of Chapin, Penny & Goering, of Medicine Lodge, argued the cause and was on the brief for appellant.
Patricia A. Gorham, assistant general counsel, argued the cause, and Brian J. Moline, general counsel, was with her on the brief for appellee Kansas Corporation Commission.
Joseph W. Kennedy, of Morris, Laing, Evans, Brock & Kennedy, of Wichita, argued the cause, and Robert W. Coykendall, of the same firm, was with him on the brief for appellees Misco Industries, Inc., and Vincent Oil Corporation.
The opinion of the court was delivered by
MILLER, J.:
This is an appeal by the petitioners, the royalty and mineral interest owners, from the district court's affirmance of a Kansas Corporation Commission order denying petitioners' application for the dissolution of the Nichols Unit, a 5800-acre unit created by the Commission in 1968 under the Kansas compulsory unitization law, K.S.A. 55-1301 et seq. The issues as framed by the petitioners are: (1) Where the unit was set up by the Corporation Commission for secondary recovery operations, and secondary recovery operations ceased in 1971, was it error for the Corporation Commission to refuse to terminate the unit? (2) Where the Corporation Commission, in its 1968 order setting up the unit, reserved jurisdiction to make further orders, was it error for the Corporation Commission to conclude that the unit would continue until terminated by Misco Industries, Inc.? (3) If the Corporation Commission is correct in its 1982 ruling that the unit continues until the working interest owner decides to terminate the unit, is such delegation of authority to the working interest owner void as beyond the jurisdiction and power of the Corporation Commission?
This is the first time that proceedings under the compulsory unitization law, K.S.A. 55-1301 to -1315, inclusive, have come before this court, and we will therefore discuss the provisions of that act, together with the factual background and the proceedings below, rather fully. The law was enacted in 1967 (L. 1967, *996 ch. 299) and has not been amended. The first section of the act, now K.S.A. 55-1301, expresses the legislative purpose. It states:
"[W]ith respect to the prevention of waste and the conservation of oil and gas and the protection of the correlative rights of persons entitled to share in the production thereof, the commission shall for said purposes have ... the further jurisdiction, powers and duties conferred or imposed upon it by this act."
K.S.A. 55-1302 defines certain terms. "Pool" is defined as an underground accumulation of oil and gas in a single and separate natural reservoir characterized by a single pressure system so that production from one part of the pool affects the reservoir pressure throughout its extent. "Waste," in addition to its meaning as used in those portions of chapter 55 dealing with the production and sale of crude oil or petroleum and with the production and conservation of natural gas, is defined to mean both economic and physical waste resulting from the development and operation separately of tracts that can best be operated as a unit.
K.S.A. 55-1303 provides for the filing of applications with the commission requesting an order for the unit operation of all or part of a pool, prescribes the contents of the petition, and requires the commission to set the matter for hearing and cause notice to be given.
K.S.A. 55-1304 empowers the commission to make an order providing for the unitization and unit operation of the pool if, upon the hearing of the application, the commission finds that three conditions exist:
"(a) The primary production from a pool or a part thereof sought to be unitized has reached a low economic level and, without introduction of artificial energy, abandonment of oil or gas wells is imminent; or the unitized management, operation and further development of the pool or the part thereof sought to be unitized is economically feasible and reasonably necessary to prevent waste within the reservoir and thereby increase substantially the ultimate recovery of oil or gas;
"(b) that the value of the estimated additional recovery of oil or gas substantially exceeds the estimated additional cost incident to conducting such operations;
"(c) that the proposed operation is fair and equitable to all interest owners...."
K.S.A. 55-1305 requires that the commission's order for unitization prescribe a plan for unitization, which plan must include many enumerated items. Those of interest here are:

*997 "(b) a statement of the nature of the operations contemplated;
....
"(j) the time when the unit operations shall commence and the manner in which, and the circumstances under which, the unit operations shall terminate and for the settlement of accounts upon such termination;
....
"(l) such additional provisions that are found to be appropriate for carrying on the unit operations and for the protection of correlative rights.
....
"An order providing for unit operations may be amended by the commission in the same manner and subject to the same conditions as are necessary or required for an original order providing for unit operations....
....
"An order may provide for the unit operation of less than the whole of a pool where the unit area is of such size and shape as may be reasonably required for that purpose, and the conduct thereof will have no material adverse effect upon other parts of the pool."
The following section, K.S.A. 55-1306, provides in part:
"All operations, including, but not limited to, the commencement, drilling, or operation of a well upon any part of the unit area shall be deemed for all purposes the conduct of such operations upon each separately owned tract in the unit area by the several owners thereof. The portion of the unit production allocated to a separately owned tract in a unit area shall, when produced, be deemed, for all purposes, to have been actually produced from such tract by a well drilled thereon. Operations conducted pursuant to an order of the commission providing for unit operations shall constitute a fulfillment of all the express or implied obligations of each lease or contract covering lands in the unit area to the extent that compliance with such obligations cannot be had because of the order of the commission."
The remaining sections of the act provide for enlargement of the area, creation of new units, taxation, recording, and other matters not germane to this litigation.
On April 22, 1968, Gulf Oil Corporation filed an application for unitization of the Nichols pool. The application contains the following:
"3. The type of operations contemplated for the unit area is secondary oil recovery operations ... by repressuring the formation with the injection of water.
....
"5. That the primary production from the Nichols pool underlying the lands hereinabove described has reached a low economic level, and without the introduction of artificial energy, abandonment of the oil wells in the Nichols pool is [imminent]. The unitized management and operation of the Nichols pool is economically feasible and reasonably necessary to prevent waste within the reservoir and thereby increase substantially the ultimate recovery of oil and gas."
*998 The Kansas Corporation Commission, after hearing, entered an order on May 24, 1968, providing for unitization of the Nichols pool in Kiowa County. Following the requirement of K.S.A. 55-1305, the commission found that the plan for unit operations was approved in writing by those required to pay at least 75% of the costs of the unit operation, and also by owners of at least 75% of the production or proceeds which are free of costs such as royalties. In language consistent with the application's statement of purpose, and with the requirements of K.S.A. 55-1304, the commission also found:
"3. The Pool, or formation, involved is the Mississippi Chert formation and the type of operation contemplated for the unit is a fluid repressuring and waterflooding or secondary recovery operation for the purpose of enhancing and increasing the ultimate recovery of oil from land within the Unit Area....
"4. The primary production from the Nichols Pool underlying the above described unit area, and which is sought to be unitized, has reached a low economic level of production and without the introduction of artificial energy, abandonment of oil wells is imminent. In addition the unitized management, operation and further development of the pool sought to be unitized is economically feasible and reasonably necessary to prevent waste within the reservoir and thereby increase substantially the ultimate recovery of oil." (Emphasis supplied.)
The order concluded that operations should:

"[c]ontinue for so long as unitized substances are produced in paying quantities, and as long thereafter as unit operations are conducted, unless sooner terminated by the working interest owners in the manner provided in the unit Agreement and the Unit Operating Agreement." (Emphasis supplied.)
What the order refers to as the "Unit Agreement" is apparently the "Plan of Unitization," which was approved in writing by the owners of over 75% (but less than 100%) of the working interests and the owners of over 75% (but less than 100%) of the royalty and mineral interests, and which was presented to the commission at the initial hearing upon Gulf's application for unitization. The "Plan of Unitization" contains, inter alia, the following provisions:
"4.1 Operating Methods. To the end that the quantity of Unitized Substances ultimately recoverable may be increased and waste prevented, the Unit Operator, under direction of the Working Interest Owners Group, shall, with diligence and in accordance with good engineering and production practices, conduct secondary recovery operations by means of injecting water and/or gas into the Unitized Formation.
"4.2 Change of Operating Methods. Nothing herein shall prevent the *999 Working Interest Owners Group from discontinuing or changing in whole or in part any method of operation which, in its opinion, is no longer in accord with good engineering or production practices. Other methods of operation may be conducted or changes may be made by the Working Interest Owners Group from time to time if determined by it to be feasible, necessary, or desirable to increase the ultimate recovery of Unitized Substances."
"Unitized Substances" were defined in a preceding section of the plan:
"1.4 Unitized Substances (unit production) means all Oil and Gas within or produced from the Unitized Formation."
"26.1 Term. The Unit and this Plan of Unitization shall continue in effect until the Working Interest Owners Group by vote of at least Sixty-Five percent (65%) of the voting interest determines that Unitized Substances can no longer be produced in paying quantities or that Unit Operations are no longer feasible."
At the time of the 1968 unitization hearing, it was estimated by experts that waterflooding would produce a total of almost three million barrels of oil during the years 1968 through 1979. Actual production amounted to a little over 200,000 barrels, almost half of that produced prior to June, 1971. Plaintiffs point out that at the present rate of production it will take almost 300 years for the wells to produce the remaining 2,800,000 barrels of oil.
After the commission entered the unitization order, Gulf, as operator, commenced a pilot waterflood project, located approximately in the center of the north half of the Nichols unit. Between January 1969 and June 1, 1971, Gulf injected over 6.4 million barrels of water into the formation. The pilot project did not work as well as expected, and Gulf and all of the other working interest owners sold their interests to Misco Industries, Inc., and it took over operations on about June 1, 1971. Misco has since been the sole working interest owner and sole operator of the unit. Almost simultaneously with the takeover, Misco ceased water injection, and there has been no injection of water or other repressuring since that time. When Misco took over, there were some seventy-nine wells located on the 5800 acres, including twenty-five producing oil wells, one gas well, some forty temporarily abandoned oil wells, several injection wells, and a water well. There were tank batteries on most of the separately owned tracts. Misco, a large part of whose business consists of salvaging oil field equipment, pulled the pipe and plugged approximately seventy-three of the wells, leaving only six producing oil wells from which production has been continuous since 1971. Misco *1000 removed almost all of the tanks, pipe and equipment from the entire unit. During the Misco years, only three new wells have been drilled, and all were unsuccessful. Misco has never worked over any of the producing wells. Production, which was in the neighborhood of sixty-five barrels per day when Misco took over in 1971, averaged about twenty-four barrels per day during the first ten months of 1981, immediately prior to the commencement of this proceeding.
The petitioners, owners of all royalty and mineral interests in the 5800-acre Nichols Unit, except for those attached to one 160-acre tract, filed an application with the State Corporation Commission on September 10, 1981, seeking an order of the commission dissolving the unit. An evidentiary hearing was held before a hearing examiner on March 16, 1982, and by order entered June 3, 1982, the commission denied the application. After stating several findings of fact, most if not all of which are undisputed, the rest of the commission's order reads:
"7. Under the terms of the unit operations agreement, which was incorporated in the order, the participation in the unit was divided into two phases. Phase I consisted of primary production and Phase II consisted of secondary production. Under the agreement Phase II participation began April 1, 1969. Under Phase II participation all interested owners are paid royalties according to the percent of their interest in the unit.
"8. Article 4 of the Plan of Unitization addresses the plan of operation. Section 4.2 entitled change of operating methods, allows the working interest owner to discontinue or modify the method of operation of the unit, when in its opinion the current operations are no longer in accordance with good engineering and production practices. Protestant Misco Industries contend that the cessation of waterflood activities were in accordance with good engineering practice. None of the parties challenged this position.
"CONCLUSIONS OF LAW
"1. Article 13 of the Kansas Statutes Annotated authorizes the Commission to issue orders for unitization upon the filing of a proper application and a finding that certain statutorily required conditions exist. (K.S.A. 55-1303 and 1304).
"2. The Commission's order of unitization effective June, 1968, sets out the terms and conditions by which the unit was to be operated and prescribes a plan for unit operation as required by K.S.A. 55-1305. This plan for unit operation is set forth in the Plan for Unitization for the Nichols Unit, Kiowa County, Kansas. This plan was made a part of the Commission's order.
"3. Article 26 of the Unitization Plan (page 15) sets out the term of the unit.
26.1 provides that
`Term. The unit and this Plan of Unitization shall continue in effect until the working interest owners group by vote of at least sixty-five percent (65%) of the voting interest determines that unitized substances can no longer be produced in paying quantities or that unit operations are no longer feasible.'

*1001 Testimony of witnesses for Misco Industries, the working interest owner, established that Misco believes that unit operations are feasible and in fact necessary to the ultimate recovery of the hydrocarbons underlying the unit.
"[4.] The Commission finds that because the voting interest in the unit (working interest owners) have not determined that unitized substances can no longer be produced in paying quantities and there is still production from the unit, the order for Unitization for the Nichols Unit, Kiowa County, Kansas, shall remain in effect until such time as the determinations as set forth in Article 26, Section 26.1 are met.

"IT IS, THEREFORE, BY THE COMMISSION ORDERED that the application of certain landowners for an order dissolving the Nichols Unit be and the same is hereby denied.
"The Commission retains jurisdiction of the subject matter and the parties for the purpose of entering such further order or orders as from time to time it may deem proper." (Emphasis supplied.)
After oral argument, an application for rehearing was denied by the commission on July 29, 1982.
Petitioners appealed to the district court, which affirmed. The district court's findings of fact and conclusions of law are as follows:
"Findings of Fact
"1. The Plaintiffs, being the landowners, filed an application with the State Corporation Commission in September of 1981 seeking to dissolve a Commission Order dated May 24, 1968, which unitized about 5800 acres for the purpose of water flooding to stimulate secondary production of oil from the Mississippi Chert formation under the Nichols Unit in Kiowa County, Kansas. The application was denied and after rehearing oral argument, the denial was repeated. Plaintiffs have appealed under K.S.A. 55-606.
"2. The record reflects that unitization plan was approved upon the application of Gulf Oil in 1969, specifying that the Nichols Unit, comprised of approximately 5800 acres, was fast becoming uneconomical to operate due to decreasing production. The Unitization Plan specified that secondary production could be stimulated by the injection of an artificial energy source into the Mississippi Chert Pool, and was approved by the then current surface owners and working interest owners. The plan was authorized by the Commission's Order. It was executed by the injection of 6.2 million barrels of water into the Mississippi Chert Reservoir, but notwithstanding Gulf's best scientific and technical estimates, the plan was a failure. Gulf substantially abandoned the water injection and secondary flooding program in 1971 and negotiated a sale of its interest in the Nichols Unit to MISCO, the present working interest owner.
"3. MISCO, apparently, is primarily a salvage company specializing in buying and selling used oil field exploration and production equipment. It purchased the Gulf interest and proceeded to commence a salvage program plugging numerous wells, dismantling and removing most all of the tank batteries, and other production equipment for resale. It terminated the water *1002 injection program because of economic infeasibility due to the then current crude oil price of $3.00 per barrel.
"4. All production from the Nichols Unit continued to decline until 1975 when a small "kick" increased production. MISCO made no effort to drill any other wells to explore any other formations or continue any additional exploration in the Mississippi Chert until sometime in 1981. During the intervening 10 years, the price of crude oil had increased to approximately $40.00 per barrel. MISCO continued to operate the 6 wells that are still producing on the unit which, during the first 10 months of 1981, produced less than 25 barrels of oil per day.
"5. The record also reflects that during this time period production payments were apportioned under the plan to the original surface owners and their successors in interest. Other companies are interested in making further exploration into the unit, both for purposes of primary and secondary recovery. Agreements have been reached between MISCO and Murfin Oil whereby Murfin would reimplement a secondary water flooding program. Another agreement has been reached between MISCO and Vincent, whereby Vincent would explore for primary production in other formations beside the Mississippi Chert.
"6. The 25 barrels per day production constitutes a unitized substance being produced as contemplated by the Commission's Order originally.
"7. The unit operating agreement provides that termination shall occur only upon a determination that unitized substances can no longer be produced in paying quantities or that unit operations are no longer feasible. This determination must be made by vote of at least 65% of the working interest owners. There is no evidence that either of these conditions for termination have been fulfilled.
"8. Pursuant to the plan of unitization in Sec. 4.2, the operative methods may be changed, or discontinued, when the working interest owner determines that current operations are no longer in accordance with good engineering and production practices. Nothing in the record contends that the termination of the water flood operation in 1971 was not in accordance with good engineering and production practices. The evidence in the record does suggest that due to technological developments in the field of secondary water flooding, production could probably be enhanced if these new techniques are implemented within the Mississippi Chert Reservoir.
"9. The record is silent as to the effects of the current secondary water flood proposal upon possible oil and gas available for primary production in other formations than the Mississippi Chert.
"Conclusions of Law
"A. Since there is no challenge to the original authorization of the unitization plan, no review of its propriety need be made.
"B. The Defendants and Respondents moved for a Summary Affirmance of the Commission's Order contending that the District Court is restricted, in its scope or review, to considering whether, as a matter of law, the administrative agency, here the Corporation Commission, acted fraudulently, arbitrarily, or capriciously, whether the Administrative Order was substantially supported by evidence, and whether the tribunal's action was within the *1003 scope of its authority. The authorities cited by the Defendants have recognized this to be the scope of judicial review of administrative action in numerous instances, however, these authorities are based on the assumption that there is no contrary legislative provisions. (See Micheaux v. Amalgamated Meat Cutters and Butcher Workmen, 231 Kan. 791, and, particularly, p. 794.) Here the scope of review is established by statute set out in K.S.A. 55-606, which provides as follows:
`Any rule, regulation, order or decision of the Commission may be superseded by the District Court upon such terms and conditions as it may deem proper... The Court shall not be bound by any finding of fact made by the Commission.
"The authority of the Court shall be limited to a judgment, either affirming or setting aside in whole, or in part, the rule, regulation, order, or decision of the Commission,'
thus establishing a scope of review as being de novo on the record. With this scope of review a summary affirmance would be inappropriate.
"C. The provisions of the unitization plan which were originally agreed upon concerning the term of the plan and the method of termination are contractual and binding upon the original surface owners and their successors in interest so long as the continued enforcement and execution of the contract does not contravene public policy. In fact, the evidence of MISCO Industries supports the conclusion that the ongoing unit operation is necessary to prevent the waste of the hydrocarbons underlying the unit and subject only to secondary recovery operations which complies with the public policy declared by the legislature in establishing the unitization procedure.
"D. In the absence of a showing that the conditions for termination of the plan have been met, unitized operations pursuant to the plan must continue in effect until such time as the determinations required by Article 26, Sec. 21.1 of the plan are made.

"E. No conclusion or finding in this order should be construed as any indication of this Court's approval or disapproval of planned and prospective operations of MISCO or any assignee in any other formation under the Nichols Unit. These conclusions are restricted to secondary recovery procedures or operations within the Mississippi Chert formation in the Nichols Unit.
"F. Because of the above findings and conclusions the order of the Corporation Commission dated June 3, 1982, is hereby affirmed." (Emphasis supplied.)

I. WHETHER THE UNIT MUST BE DISSOLVED SINCE WATER INJECTION HAS CEASED
Petitioners contend that the unit was created for the sole or at least the primary purpose of secondary recovery operations, and that since secondary recovery operations ceased in 1971, the unit must be dissolved. The original Plan of Unitization, circulated among and approved by more than 75%  but less than 100%  of the royalty and mineral interest owners, clearly called for secondary recovery operations by means of water injection. The *1004 plan, however, also provided that the working interest owners could discontinue or change the method of operation according to the dictates of good engineering or production practices.
The statute under which compulsory unitization was secured, K.S.A. 55-1304, quoted at length earlier in this opinion, provides that unitization may be imposed by the commission if it finds that (1) "primary production from a pool or a part thereof sought to be unitized has reached a low economic level and, without introduction of artificial energy, abandonment of oil or gas wells is imminent"; or (2) "the unitized management, operation and further development of the pool ... is economically feasible and reasonably necessary to prevent waste within the reservoir and thereby increase substantially the ultimate recovery of oil or gas...."
The 1968 order of the corporation commission included both findings, stated in separate sentences in paragraph No. 4, quoted in full above. Thus, the commission made two findings which would support and authorize its unitization order: The need for the introduction of artificial energy; and the need for unitized management, operation and development to prevent waste. The separation of the two distinct findings in the statute by a semicolon and the conjunction "or" clearly shows that the legislature intended that compulsory unitization could be imposed by the corporation commission upon either finding  need for introduction of artificial energy or the need for unitized management, operation and development. This has been the interpretation followed by at least one commentator on the statute. Professor Ernest E. Smith, commenting in The Kansas Unitization Statute: Part I, 16 Kan. L. Rev. 567 (1968), says:
"Under the terms of the Kansas statute two types of field conditions will warrant the issuance of a unitization order. The first field condition is met when `the primary production from a pool or a part thereof sought to be unitized has reached a low economic level and, without introduction of artificial energy, abandonment of oil or gas wells is imminent.' The second exists whenever `the unitized management, operation and further development of the pool or the part thereof sought to be unitized is economically feasible and reasonably necessary to prevent waste within the reservoir and thereby increase substantially the ultimate recovery of oil or gas.' In general, the first field condition seems to contemplate a pool which is ripe for unitized secondary recovery operations, and the second, a pool which will be less wastefully and more economically operated under a unit plan during the primary stage of its development. However, the definitions of the field conditions seem to overlap considerably; and, upon closer *1005 examination, it is not clear whether they are in fact referring to two different types of relatively uncommon situations or whether, together, they were intended to permit unitization of virtually every reservoir in the state. The latter interpretation seems the more likely one.
....
"The problem of defining the precise scope of the first field condition warranting a unitization order may, however, be largely academic; for the second type of field condition which warrants such an order is defined so broadly that it may very well include every oil and gas field in the state, and apply to both primary and secondary recovery operations. According to the statute a unitization order may be issued if the commission finds that `the unitized management, operation and further development of the pool or the part thereof sought to be unitized is economically feasible and reasonably necessary to prevent waste within the reservoir and thereby increase substantially the ultimate recovery of oil and gas.' In virtually every reservoir, waste can be prevented and the ultimate recovery of oil and gas substantially increased through a program of unitization, whether it is begun immediately after discovery as a part of primary development or as a secondary recovery operation at a time when primary production has almost played out. The only question may concern the economic feasibility of unitized operations in a particular field." 16 Kan. L. Rev. at 569, 573-74.
We point out, however, that the Corporation Commission in its 1982 order did not find that unitization must continue for either of the reasons for which unitization was originally decreed. Instead, it found that Article 26, section 26.1, of the original Plan of Unitization provided that the unit would continue in effect until at least 65% of the working interest group owners determine that unitized substances can no longer be produced in paying quantities or that unit operations are no longer feasible; that the working interest owners (Misco) had not made that determination; and that, therefore, the order for unitization must remain in effect until such time as the determinations as set forth in Article 26, section 26.1, of the Unitization Plan are met.
The cessation of water flooding does not automatically require the dissolution of a unit established under 55-1301 et seq. The introduction of artificial energy into a reservoir is intended to move the recoverable hydrocarbons from place to place, and, one hopes, to move them away from the water injection wells and toward the producing wells, thus increasing recovery. The initial injection of large quantities of water into an oil-bearing strata may move the oil to positions where it can thereafter be recovered through ordinary or primary recovery methods. Under the Plan of Unitization approved by the commission, the operator may change its method of operation from time to time; and *1006 the commission found that the cessation of water injection in 1971 followed good engineering practice. The evidence supports this finding. (The evidence does not indicate whether the continuance of this method of production since 1971, and the reduction of the number of producing wells to six, follows good engineering practice and constitutes prudent development of the unit. The commission made no finding in this regard.)
We hold that the mere cessation of water injection does not, in itself, require the dissolution of the unit.
II. MAY THE AUTHORITY TO TERMINATE A COMPULSORY UNIT BE DELEGATED TO THE OWNER OF THE WORKING INTEREST?
The final issues are whether the Corporation Commission erred in ruling that the unit would continue until the working owner, Misco, terminated it, and whether the Corporation Commission improperly delegated to the working interest owner the authority to determine when unitization would terminate. We will consider these together.
The purposes of the compulsory unitization act, as set forth in K.S.A. 55-1301, are to prevent waste, to further the conservation of oil and gas, and to protect the correlative rights of persons entitled to share in the production thereof. The Corporation Commission did not make specific reference to these purposes in its order of June 1982 denying petitioners' request that the unit be terminated. Instead, the Corporation Commission's order is based upon the provisions of the Plan of Unitization that provide for termination. As shown above, those provisions give the power to terminate to Misco, since it owns all of the working interest. Its witnesses "established that Misco believes that unit operations are feasible and in fact necessary to the ultimate recovery of the hydrocarbons underlying the unit." The commission held that because Misco determined that unitized substances could still be produced in paying quantities and that there was still production from the unit, the order for unitization must remain in effect until Misco or some subsequent working interest owner makes contrary determinations, under the provisions of the Plan of Unitization. The district court went further and held that the Plan of Unitization was contractual and binding upon the surface (royalty or mineral interest) owners and their successors in interest, and that the unit must continue until *1007 the working interest owner determines otherwise pursuant to the plan.
The original Plan of Unitization was not a contract between all of the royalty and mineral interest owners and all of the working interest owners. Approximately 19% of the royalty and mineral interest owners and a smaller portion of the working interest owners did not agree to that plan. Unitization was forced upon those people in 1968 under the original proceeding conducted pursuant to K.S.A. 55-1301 et seq. The Plan of Unitization, however fair in its provisions as to the workings and operation of the unit, is not a contract which may be enforced against those interest holders who did not agree to its terms and who were included in the unit against their will. The unit in this case is not one created by contract; it is one imposed by the Corporation Commission under authority of law.
Both the Corporation Commission and the district court denied dissolution of the unit solely because of provisions in what they viewed as the "contract." But by no stretch of the imagination can the unwilling interest holders be considered parties to a unitization "contract." Only the Corporation Commission can impose unitization upon unwilling interest holders and then only pursuant to the statutes designated above. As Chief Justice Schroeder observed in his dissent in Mobil Oil Corp. v. Kansas Corporation Commission, 227 Kan. 594, 610, 608 P.2d 1325 (1980), "[T]he Commission's authority to compel unitization is governed strictly by statute." (Emphasis in original.) After notice and hearing, if the unit application complies with all statutory requirements and if the commission makes the required findings, the commission may order unit operation and compel unitization on the non-signing 25% royalty owners. Though they are bound by the unitization order, the non-signing owners cannot be compelled to sign a "contract."
In this case, the commission's original order provides that the unitization should continue "so long as unitized substances are produced in paying quantities and as long as unit operations are conducted...." The phrase, "in paying quantities," has a generally accepted meaning in oil and gas cases. It refers to the production of sufficient quantities of oil or gas to yield a profit to the lessee over its operating expenses, even though the drilling costs, or equipping costs, are never recovered and even though *1008 the undertaking as a whole may result in a loss to the lessee. See Pray v. Premier Petroleum, Inc., 233 Kan. 351, Syl. ¶ 5, 662 P.2d 255 (1983), and Texaco, Inc. v. Fox, 228 Kan. 589, 593, 618 P.2d 844 (1980). The petitioners apparently agree that Misco is producing oil in paying quantities, i.e., that the twenty-four barrels of oil a day, when sold at the current market price, produce sufficient revenue to pay Misco's operating expenses and yield a profit.
The original order also provides that operations shall continue "as long as unit operations are conducted...." "Unit operations" do not appear to be defined either by statute or by prior case law. Does the mere production of a few barrels of oil from one well on a unitized acreage and the payment and division of the resulting royalties among all of those interest holders who have some right thereto constitute unit operations? If, for example, Misco could pay its operating expenses and perhaps even make a small profit from one well producing two barrels a day, and thus establish that it was recovering oil in paying quantities, and if at the same time it divided the royalties therefrom among the myriad owners of royalty interests in the 5800 acres comprising the Nichols unit, would such activity constitute "unit operations"? We think not.
Unit operation is said to represent development and operation of an oil pool as a unit. It involves the consolidation or merger of all of the interests in the pool and the designation of one or more of the parties as operator. This method of development will permit the location of wells so as to secure the most scientific use of the natural reservoir energy in the production of oil and gas by primary recovery methods. See Campbell v. Fields, 229 F.2d 197, 199, 200 (5th Cir.1956). It would also include the location of both induction and production wells so as to secure the most scientific use of artificial energy in the production of oil and gas by secondary or tertiary recovery. "Unit operation" must mean not only the process of unitizing the area, centralizing management, pumping a few wells, and dividing the royalty proceeds according to schedule; it must also mean the good faith operation and prudent development of the unit.
The Supreme Court of Arkansas, in Christmas v. Raley, 260 Ark. 150, 539 S.W.2d 405 (1976), held that the implied covenant to develop applies to unitized oil operations even when unitization *1009 is compulsory, and breach of that covenant is a ground for dissolution of the unit and cancellation of the leases. We agree. Kansas, like Arkansas, has long recognized that there is imposed by law upon an oil and gas lessee an implied covenant to reasonably develop the lease. This covenant is measured by the "reasonably prudent operator test." See K.S.A. 55-223; Rush v. King Oil Co., 220 Kan. 616, 627, 556 P.2d 431 (1976); Shaw v. Henry, 216 Kan. 96, Syl. ¶¶ 1, 2, 531 P.2d 128 (1975); Stamper v. Jones, 188 Kan. 626, 631, 364 P.2d 972 (1961); Renner v. Monsanto Chemical Co., 187 Kan. 158, 166, 167, 168, 354 P.2d 326 (1960); Baker v. Huffman, 176 Kan. 554, 271 P.2d 276 (1954). In King Oil we said:
"Under the implied covenant of reasonable development when oil in paying quantities becomes apparent and the number of wells to be drilled on the lease is not specified, there is an implied obligation on the lessee to continue development of the leased premises by drilling as many wells as reasonably necessary to secure the oil for the common good of both the lessor and the lessee." Syl. ¶ 1.
"Under the prudent operator test the lessee must continue reasonable development of the leased premises to secure the oil for the common advantage of both lessor and lessee and may be expected and required to do that which an operator of ordinary prudence would do to develop and protect the interests of the parties." Syl. ¶ 3.
The owner of an individual tract has the right to expect his lessee to prudently develop that tract under an oil and gas lease. When, however, the tract becomes unitized by order of the Corporation Commission, operations conducted pursuant to the order of the Corporation Commission providing for unit operations "constitute a fulfillment of all the express or implied obligations of each lease...." K.S.A. 55-1306. We hold that the implied covenant to develop, measured by the reasonably prudent operator test, applicable to lessees of individual leases, is equally applicable to the operators of unitized leases.
The Corporation Commission has statutory authority to amend or modify its unitization orders, and to terminate unit operations. K.S.A. 55-1305. It is the regulatory body which has expertise in the field, which has competent staff advisors, and which may employ consultants when that becomes necessary. K.S.A. 55-1309. The commission is in the best position, when called upon to do so, to determine whether "unit operations" upon statutorily unitized oil and gas leases are being carried on in good faith and whether the unit is being prudently operated and developed. *1010 When applications are filed with the commission to terminate a unit, the critical issue is whether "unit operations" were those of a reasonably prudent operator at the time the application was filed. Such a determination must be made if the correlative rights of all parties entitled to share in the production are to be protected. It is the duty of the Corporation Commission to protect those rights.
Has the operator in this case exercised good faith and has it operated and developed the entire unit as a prudent operator would? The plat of the 5800 acres in this unit discloses that there is not one well on the west 2880 acres, not one well on the north 1240 acres, not one well on the south 1200 acres. Assuming that the pilot injection project in the northeastern portion of the unit pushed the oil in more than one direction from the location of the initial injection wells, would prudent operation require attempts at production in directions other than southeast of the pilot project? Would prudent development of the unit require at least some attempt to test available production to the north, west or south of the original pilot project? Once the pilot project was abandoned, would a prudent operator have attempted another pilot water injection project in some other location on the unit? Is it prudent for an operator of a unit this large to sit for ten years pumping six wells  five of them clustered together  while leaving large areas untried? Are the six wells now being pumped adequate to produce the oil underlying the entire 5800 acres, much of which is over a mile from the nearest well? Does such an operation prevent waste, conserve oil and gas and protect the correlative rights of all of the persons entitled to share in the production from this unit?
The Corporation Commission did not address these or like issues in its final order in this proceeding; rather, it based its denial of dissolution solely upon the original Plan of Unitization, allowing the present operator sole discretion to determine whether or not this unit shall continue. This resolution by the Corporation Commission is not in the public interest, is not authorized by statute, and cannot be viewed in any sense as protective of the interests of those persons who are entitled to share in the production of this unit except one  the holder of the working interest. The Corporation Commission cannot delegate its statutory authority and responsibilities to the owner of the *1011 working interest. Voluntary termination by the working interest owner is but an alternative method of termination. That alternative remains open to the working interest owner under the Plan of Unitization and under the Corporation Commission's order of May 24, 1968. However, the Corporation Commission remains the ultimate authority and may terminate compulsory unitization if it determines that unit operations are not being carried on in a prudent manner, or that the purposes of the act, as set forth in K.S.A. 55-1301, cease to be served.
The judgment is reversed and this case is remanded to the district court with directions to remand the matter to the Corporation Commission for further proceedings consistent with this opinion.
HERD, J., not participating.